James R. MEIER, Plaintiff,

v.

TEXAS INTERNATIONAL DRILLING FUNDS, INC., a Delaware Corporation, and Shearson, Hammill & Co., a Delaware Corporation, Defendants.

No. C–76–780 WHO.

United States District Court, N. D. California.

May 2, 1977.

James B. Little, Little, Evans, Zoller, Dok, Daiker & Matteoni, San Jose, Cal., for plaintiff.

Michael L. Kirby, Post, Kirby, Wideman & Noonan, San Diego, Cal., for Texas Intern.

Samuel A. Keesal, Jr., Peter R. Boutin, Samuel A. Keesal, Jr., Law Offices, Long Beach, Cal., for Shearson, Hammill & Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ORRICK, District Judge.

To obtain a so-called "tax shelter," plaintiff, acting through a brokerage firm, de-

fendant Shearson, Hammill & Co., invested $40,000 to obtain a limited partnership interest in two oil and gas drilling programs formed and operated by defendant Texas International Drilling Funds, Inc. After losing approximately ninety percent of his investment, plaintiff brought this action against defendants, alleging that the defendants falsely represented to him that the limited partnership was a conservative investment and part of a conservative development program, that the risk of loss would be only ten percent of the total amount invested, and that the funds of the partnership would be placed eighty percent in "good, economic development wells" and twenty percent in "higher risk exploratory wells." Plaintiff alleged that these misrepresentations gave rise to common law fraud, and violations of Section 10(b) of the Securities Exchange Act of 1934 (hereinafter cited as the 1934 Act) and Rule 10b–5.

The case was tried to the Court, sitting without a jury, and the Court, having found for defendants, now makes the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

1. Plaintiff, a gynecologist, graduated from Stanford University in 1959, and from UCLA medical school in 1963; he spent two years in the U.S. Army, finishing in 1966, one year in residency training at UCLA, entered Stanford ob-gyn residency in 1967 and began private practice as a physician in 1970.

2. Plaintiff's income, which was approximately $6,500 in 1968 and approximately $8,400 in 1969, rose to over $100,000 in 1971.

3. Plaintiff first invested in a stock or security in approximately 1967 and, by December 1971, had engaged in approximately 30–40 stock transactions. He also engaged in commodity trading during 1968, when his annual income was approximately $6,500.

4. Defendant Shearson, Hammill & Co., ("Shearson"), is a Delaware corporation engaged in the general securities brokerage business, a registered broker-dealer with the Securities Exchange Commission, a member corporation of the National Association of Securities Dealers, and a member of the New York Stock Exchange and other stock exchanges, and is doing business in California. At all times relevant to this case, Paul McGibbons was the western regional Mutual Fund manager for Shearson and assumed responsibility for the marketing of tax shelters.

5. James Bishop commenced acting as plaintiff's stockbroker at Shearson in 1968, and plaintiff and Bishop have been close personal friends since that time. Bishop was, during 1965 through September 1972, a registered representative and employee of Shearson in its office in Palo Alto, California. Plaintiff visited Shearson's offices three or four times per week to discuss market conditions with Bishop. His medical office at Chope Hospital in San Mateo, California, was within a block of the Shearson brokerage firm where Bishop had his office. During the period 1968–1971, Bishop made various stock recommendations to plaintiff for his review and for possible purchase by plaintiff. Plaintiff also utilized the brokerage firm of Bache & Company in Palo Alto, California, during approximately 1967–1969. Bishop is currently the office manager of the brokerage firm of Hornblower & Weeks—Hemphill Noyes in Seattle, where plaintiff now has his account.

6. Defendant Texas International Drilling Funds, Inc. ("Texas International") was, at all material times during 1970–1975, a Delaware corporation with its executive offices in Oklahoma City, Oklahoma, and its operations offices in Shreveport, Louisiana.

7. The Texas International Drilling Fund ("The Fund") is a limited partnership organized under the laws of the state of Oklahoma and was, at all times pertinent hereto, engaged in the business of exploring and drilling for oil and gas. The Fund is a multi-partnership entity which includes Texas International's 1971 year-end drilling partnership and the 1972–2 drilling partnership.

8. Texas International was the general partner of The Fund and the general partner of the 1971 year-end and 1972–2 drilling partnerships, and the investors purchasing limited partnership interests therein were the limited partners. Texas International acted as fund manager and as partnership operator of the 1971 year-end and 1972–2 drilling partnerships. The Fund's sole purpose was to pay over to the drilling partnerships the moneys subscribed by the venturers.

9. In January 1970, The Fund established a six-year program for raising $25 million in registered public offerings by sponsoring several drilling partnerships to which it made specific allocations of capital. In order to keep The Fund's registration statement with the S.E.C. current, Texas International filed updated registration statements with the S.E.C. and distributed updated printed prospectuses each year.

10. Texas International and Shearson entered into a selling agreement whereby Shearson agreed to act as a nonexclusive broker with respect to the sale of interests to investors in the various drilling partnerships to be formed by The Fund, and Shearson would receive a seven percent sales commission, paid by Texas International, on all such sales.

11. On or about December 17, 1971, plaintiff purchased a limited partnership interest in Texas International's 1971 year-end drilling partnership for a cash price of thirty thousand dollars and, in July 1972, plaintiff purchased a limited partnership interest in a Texas International 1972 drilling partnership for a cash price of ten thousand dollars. The 1971 and 1972 limited partnerships were part of a series of oil and gas drilling limited partnerships being offered and sold by Texas International through various licensed broker-dealers.

12. Plaintiff first had an understanding of the term "tax shelter" sometime during 1969 or 1970, shortly before he went into private practice and was faced with the possibility of his income level rising. He understood that a tax shelter investment would result in some portion of the funds invested being either tax deductible or resulting in a tax savings in the year of investment.

13. The first tax shelter type investment made by plaintiff was the Damson Oil Fund in August 1971, which was a result of information provided to him by Bishop, who received a sales commission on that investment. The tax shelter benefits offered by the Damson Oil Fund in 1971 and the 1971 year-end drilling partnership were essentially the same. Plaintiff had been provided with a written prospectus and knew at the time he invested in the Damson Oil Fund that it was an exploratory oil and gas fund with a tax shelter feature.

14. Plaintiff understood in 1971 that a high risk investment involved a greater probability of losing all or some of the funds he invested than would a low risk investment. Nonetheless, plaintiff considered various potential tax shelter investments in the latter part of 1971 because he found his income was higher for that year than he had anticipated. Plaintiff had discussed tax shelter type investments with Bishop before 1971, and first learned of the Texas International Tax Shelter Program from Bishop during the latter part of 1971.

15. During the latter part of 1971, Bishop provided plaintiff with a single page, undated document entitled "Tax Shelters Open for Remainder 1971," plaintiff's exhibit 2, which identified six potential tax shelter investments being offered or sponsored by Shearson for that year, including The Fund.

16. Plaintiff was a calendar year taxpayer in 1971, and the deadline for making any tax shelter investments for that year was December 31, 1971. The deadline for plaintiff to make an investment in the 1971 year-end drilling partnership was December 20, 1971.

17. An updated written prospectus, dated May 27, 1971, entitled "Supplemental Prospectus" was filed with the S.E.C. and distributed by Texas International during 1971 through the facilities of interstate commerce to Shearson and Bishop in con-

nection with the sale of interests in the 1971 year-end drilling partnership. Bishop delivered a supplemental prospectus to plaintiff, who read and understood all of the material contained therein, including the "risk" factors involved in oil and gas drilling, and particularly the high risk involved in investments in oil and gas tax shelter programs.

18. The following language appeared in boldface type on the cover of the supplemental prospectus: "THESE SECURITIES ARE SPECULATIVE IN THAT OIL AND GAS EXPLORATION INVOLVES A HIGH DEGREE OF RISK." The supplemental prospectus also stated that "oil and gas drilling is highly speculative, and is marked by unprofitable efforts, not only from dry holes but from wells which, though productive, do not produce oil and gas in sufficient amounts to return a profit on the amounts expended;" the areas in which The Fund anticipated drilling, including Canada, were described; and the fact that The Fund anticipated expending approximately 80% of the funds on semi-proven and 20% on exploratory drilling was set forth, as well as a description of the results of prior drilling fund operations and partnerships. The supplemental prospectus stated that ". . . this prior experience cannot be considered indicative of the results to be expected under operations conducted by future drilling partnerships . . . ." and then set out the mechanics by which any possible redemption would be computed, indicating that any computations toward a possible redemption must await completion of drilling. The supplemental prospectus contained a full and complete disclosure of all material facts and information with respect to a potential investment in the 1971 year-end drilling partnership and did not contain any untrue statements of material fact or omit to state any material fact required or necessary to make the statements contained therein not misleading. The supplemental prospectus clearly and adequately set forth the high degree of risk involved in an investment in the 1971 year-end drilling partnership.

19. Plaintiff knew in 1971 that an exploratory oil and gas program involved the drilling of wells in a previously untried area or where there had been no other known oil or gas wells in that area, and that "developmental drilling" was the drilling of wells in an area where there had been a previously successful oil or gas well drilled, and further understood in 1971 that it was possible to drill a well which would be characterized as a "developmental well" and still have a dry hole. Plaintiff also was aware that, even in the case of a producing well, the total amount of production from that well is still subject to estimation and speculation at that point in time.

20. Use of the term "development" or the term "developmental" is an approved designation of the American Petroleum Institute, which institute approves the designations of "developmental" and "exploratory." The term "developmental" is generally accepted to include drilling in proven and semi-proven fields, and use of the phrase "80% development" in the supplemental prospectus is consistent with the reference in the supplemental prospectus to 80% semi-proven. Plaintiff was not misled by the use of the term "developmental" by defendants and their employees.

21. The decision as to the specific amount of funds to be invested in any particular well or drilling prospect in the 1971 year-end and 1972–2 drilling partnerships was within the discretion of the management of Texas International, and more than 80% of the available funds in the 1971–5 and 1972–2 partnerships were in fact expended on "developmental" or "semi-proven" prospects.

22. The only officer, employee, agent or representative of Texas International with whom plaintiff ever spoke or communicated prior to his investment in the 1971 year-end drilling partnership was Wade Davis, a sales representative for Texas International. Plaintiff never had any personal meeting with Davis prior to his investment in the 1971 year-end drilling partnership, and plaintiff's sole contact with Davis prior to December 17, 1971 consisted of a single

telephone call to Davis. During their one telephone conversation prior to plaintiff's investment in The Fund, plaintiff did not tell Davis that he was interested in a conservative tax shelter investment and Davis did not guarantee a specific return on plaintiff's investment. Plaintiff has never met any other officer, employee, agent or representative of Texas International or any of its affiliated companies other than a very brief meeting with Davis during the summer of 1972, which occurred after plaintiff's investment in the 1972–2 partnership.

23. At the time of his investment in the 1971 year-end drilling partnership, plaintiff signed a suitability letter which specifically stated:

> "I understand that Texas International Drilling Fund—series A is a limited partnership formed for the purpose of exploring for oil and gas, and that the exploration and discovery of oil, gas and other hydrocarbons is a highly speculative and uncertain undertaking whose advantages and benefits are generally limited to a certain class of investors. I further understand that interests in this program may only be sold in California to persons who understand the nature of the program and for whom the investment is suitable."

Plaintiff had the opportunity to review in detail the suitability letter and consult with Bishop concerning the contents of that letter prior to his execution of the letter. Plaintiff read the contents of the suitability letter in its entirety before he signed it on December 17, 1971, and he understood that his execution of the suitability letter on December 17, 1971 was required by the California Corporations Commissioner and that he could not invest in the 1971 year-end drilling partnership unless he signed the suitability letter.

24. Plaintiff never told Bishop, McGibbons or Davis that there was anything contained in the suitability letter which he was unable to understand, nor did he ever raise any questions to Bishop, McGibbons or Davis concerning any of the material or statements contained in the suitability letter before he signed it. The suitability letter which plaintiff signed with respect to The Fund was not the first such suitability letter which plaintiff had executed with respect to his investments.

25. Plaintiff understood that the purpose of the suitability letter was to limit the availability of that investment to sophisticated and high tax bracket investors, and that another purpose of the suitability letter was to limit the investment to persons who could appreciate the risk involved in that type of a tax shelter. Plaintiff further understood when he signed the suitability letter that he was knowingly and intentionally representing to Texas International that he understood the highly speculative and uncertain nature of an investment in the 1971 year-end drilling partnership and was representing other material facts about himself which qualified him to purchase an interest in the 1971 year-end drilling partnership. Texas International relied upon plaintiff's statements and representations regarding his sophistication and his understanding of the highly speculative and uncertain nature of an investment in the 1971 year-end drilling partnership and his own personal qualifications as a knowledgeable, sophisticated and wealthy investor in accepting plaintiff's subscription in the 1971 year-end drilling partnership.

26. At the time of plaintiff's investments in the 1971 year-end and 1972–2 drilling partnerships, he executed separate limited partnership agreements with Texas International.

27. Plaintiff received periodic letters and reports from Texas International regarding the wells in which the 1971 year-end drilling partnership had an interest, and received a letter from Texas International in September 1972 advising him that the well in which the 1971 year-end drilling partnership had the greatest amount of its funds invested had turned out to be a dry hole.

28. Plaintiff considered in December 1971 that he had a relationship of trust and confidence with Bishop, based on his prior experience and dealings with Bishop, and he

was in contact with Bishop on a daily basis during December 1971.

29. Bishop spent less than four hours with or on behalf of plaintiff with respect to the Texas International Tax Shelter Program during 1971, and that investment was the largest tax shelter sale Bishop had during 1971. Plaintiff's tax shelter investments in the 1971 year-end drilling partnership and the Damson Oil Fund constituted more than half of Bishop's total dollar volume of tax shelter sales for 1971. Bishop encouraged plaintiff to invest in the 1971 year-end and 1972–2 drilling partnerships, and was interested in obtaining sales commissions on the sales of that tax shelter to plaintiff.

30. Shearson received seven percent commissions on plaintiff's investments in the Texas International drilling partnerships, half of which were paid directly to Bishop.

31. Plaintiff and Bishop discussed the tax shelter aspects or tax savings aspects of the 1971 year-end drilling partnership prior to plaintiff's investment in that tax shelter, and Bishop never told plaintiff that Shearson would guarantee that his risk of loss would not exceed a certain amount of the total funds invested in the 1971 year-end drilling partnership.

32. During his employment with Shearson, Bishop had no particular area of specialization and had received no special training for tax shelter investments. Bishop had never had any training in the oil and gas field, had never studied any materials on the technical aspects of oil and gas exploration, and never sold an investment in an oil and gas shelter prior to 1971. It was Bishop's custom and practice not to read or review prospectuses on various tax shelter programs being offered by Shearson, and Bishop never read or reviewed the 1971 supplemental prospectus. It was not Bishop's custom and practice to sit down with an investor and go through a suitability letter with him before having the investor sign such a letter. Bishop was instructed during his training program at Shearson that he was to make oral statements and

representations regarding a prospective investment only so long as they were consistent with the written prospectus regarding that investment.

33. Plaintiff never asked any questions of Bishop or Davis regarding the supplemental prospectus, or any of the language contained therein, and neither Bishop nor Davis ever told him to disregard or ignore the supplemental prospectus. Neither defendants nor defendants' employees ever told or guaranteed plaintiff prior to his investment in The Fund that all or a specific amount of his investment would be returned to him. Plaintiff understood at the time he made his investment in The Fund that the amount of the return, if any, on that investment would be dependent upon the success of the wells that were drilled for that partnership. Plaintiff understood that any oral statements made to him regarding potential risk of loss with respect to the 1971 year-end drilling partnership prior to his investment in that tax shelter program were only estimates.

34. Bishop considered plaintiff's investment in Damson Oil Fund to be a high risk investment, and the printed prospectus which plaintiff received with respect to Damson Oil Fund did not contain any disclosures on the cover of the prospectus with respect to the investment being highly speculative or high risk. Bishop considered plaintiff's investments in the 1971 year-end and 1972–2 drilling partnerships to be relatively high risk investments.

35. The percentage of write-off or tax shelter of a particular tax shelter program was a material factor for Bishop in 1971 in determining whether or not an investor might be interested in a tax shelter program, and it was Bishop's experience that most tax shelter investments are made toward the end of the calendar year.

36. In all of the discussions between plaintiff and Bishop during 1971, the 1971 year-end drilling partnership was discussed as a tax shelter investment, and both plaintiff and Bishop considered the 1971 year-end drilling partnership to be a tax shelter. Bishop never attempted to sell any interest

in any tax shelter program other than those which were submitted to him by Shearson, and Bishop considered during 1971 that the two real estate tax shelters shown on the Shearson document, plaintiff's exhibit 2, were the least risky of those six tax shelters. Bishop understood during 1971 that there were certain limitations in terms of income tax bracket and net worth for an individual before he could invest in certain tax shelters in California, and Bishop had the opinion during 1971 that by virtue of plaintiff's prior experience and education, plaintiff was capable of analyzing investments for himself. Bishop understood during 1971 that any redemption or buy-back feature in the 1971 year-end drilling partnership was optional, and the amount of any such offer was dependent upon the success of the drilling efforts.

37. Plaintiff never told Bishop during 1971 that he was looking for a tax shelter with a low degree of risk. Bishop never heard anyone guarantee any specific return or rate of return to plaintiff on his investment in the 1971 year-end drilling partnership, either before or after that investment was made, and Bishop considered the 1971 year-end drilling partnership to be a suitable tax shelter investment for plaintiff. Bishop heard no oral statements made by Davis to plaintiff concerning the 1971 year-end drilling partnership before plaintiff invested in that program, and plaintiff never discussed the technology of oil and gas exploration or drilling with anyone in Bishop's presence. Neither defendants nor any of defendants' employees ever represented to plaintiff that the down-side risk or the risk of loss for an investment in the 1971 year-end drilling partnership was ten percent of the total amount involved.

38. Any use of the term "low risk" or of the term "conservative" by defendants or any of defendants' employees with respect to the Texas International drilling partnerships was in the context of comparing these programs to an exploratory oil and gas tax shelter program, and both Bishop and plaintiff were aware that the risk of loss could be greater than was shown by the past record of the Texas International drilling partnerships.

39. Plaintiff never made any statement to Bishop, McGibbons or Davis with respect to the degree of risk he was going to accept in making an investment in the 1971–5 or 1972–2 partnerships.

40. Defendants did not expressly or impliedly authorize any person to make any statement whatsoever not contained in, or inconsistent with, the supplemental prospectus. Defendants acted honestly and in good faith, and with no intention to take advantage of or defraud plaintiff in connection with his investment in the 1971 year-end and 1972–2 drilling partnerships.

41. Plaintiff has also invested in M & O Oil Development, in which plaintiff is one of three partners with respect to the ownership of oil and gas wells in Pennsylvania, and also invested in A & B Oil Development, a program where he was a general partner with respect to some oil and gas properties in West Virginia. Plaintiff's investment in the A & B oil program resulted in his receiving a tax write-off of approximately 90%–100% of his investment of $32,-000.

42. Plaintiff has also invested $10,000 in Chaparral Cattle, a cattle tax shelter program, through Bishop, who received a sales commission, and plaintiff executed a suitability letter when he made that investment. Plaintiff received a tax write-off of slightly more than 100% as a result of his investment in the Chaparral Cattle Tax Shelter Program, and thereafter lost his entire investment.

43. Plaintiff's primary purpose for making an investment in the 1971 year-end and 1972–2 drilling partnerships was to obtain tax shelter relief for those taxable years. Plaintiff understood on December 17, 1971 that the amount or percentage of his income tax write-off on his 1971 income tax return relating to an investment in the 1971 year-end drilling partnership would be approximately 100% of the amount invested. As the result of plaintiff's investment of $30,000 in the 1971 year-end drilling partnership, he reported a tax loss or tax deduc-

tion in an amount slightly in excess of $30,000 for the 1971 taxable year, which resulted in a reduction or savings of more than $15,000 on his 1971 federal income taxes.

44. In May of 1973, plaintiff received a buy-back or redemption offer of $1,500 from Texas International for his interest in the 1971 year-end drilling partnership, which represented the reasonable or fair market value of plaintiff's partnership interest on that date, and plaintiff elected not to accept the May 1973 redemption offer.

45. In May of 1976, plaintiff received a buy-back or redemption offer of $1,535 from Texas International for his interest in the 1972–2 drilling partnership, which plaintiff elected not to accept. Plaintiff has received approximately $3,400 in royalties from his interest in the 1972–2 drilling partnership, and had he accepted the redemption offer plaintiff would have recovered fully almost 50% of his investment in that partnership, irrespective of additional tax savings.

## CONCLUSIONS OF LAW

1. Federal jurisdiction over the subject matter, and venue, are proper in this action. 15 U.S.C. § 78aa; 28 U.S.C. § 1332(a).

■ 2. A private cause of action for damages will not lie under section 10(b) of the 1934 Act and Rule 10b–5 thereunder in the absence of specific proof of "scienter", *i. e.,* the intent to deceive, manipulate or defraud on the part of defendant. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

■ 3. Where the evidence establishes that plaintiff has both sufficient experience to conduct his own investment affairs and has access to sufficient information to understand the nature of the investment, he has a duty of reasonable diligence which must be exercised to create a right to recover under the securities laws. *Eichen v. E. F. Hutton & Co.,* 402 F.Supp. 823, 830 (S.D. Cal.1975).

■ 4. Under the Federal Securities Laws, a reasoned and justified statement of opinion, one with a sound factual or historical basis, is not actionable *G. & M. Inc. v. Newburn,* 488 F.2d 742, 745–746 (9th Cir. 1973); *Eichen v. E. F. Hutton & Co., supra,* 402 F.Supp. at 829.

5. The supplemental prospectus and the suitability letter required by the California Commissioner of Corporations fully disclosed the risks in the 1971 year-end drilling partnership. *Id.* at 850.

■ 6. Defendants did not make any misstatement of material fact to plaintiff and did not omit to state any material fact, in light of the circumstances. *Id.* at 827.

7. Defendants did not intend to deceive, manipulate or defraud plaintiff and did not employ any device, scheme or artifice to defraud plaintiff in connection with the offer and sale of the fund's limited partnership interests to plaintiff.

8. Although in some circumstances reckless behavior might be sufficient for liability under § 10(b) of the 1934 Act and Rule 10b–5, *Ernst & Ernst v. Hochfelder, supra,* 425 U.S. at 194 n.12, 96 S.Ct. 1375, defendants exhibited no such recklessness in this case.

9. Defendants did not engage in any act, practice or course of business which operated as a fraud or deceit upon plaintiff in connection with the offer and sale of the limited partnership interests.

10. Defendants breached no duty with respect to plaintiff, considering the relationship of the parties, access to necessary information, and related necessary factors as established in *White v. Abrams,* 495 F.2d 724 (9th Cir. 1974.)

11. Plaintiff is not entitled to judgment against defendants, or any of them, and judgment shall be entered in favor of defendants, and costs shall be paid by plaintiff.

Defendants are ordered to prepare, serve and file on or before May 23, 1977, a judgment in accordance with the foregoing findings of fact and conclusions of law in form approved by the plaintiff.