**In re CONVERGENT TECHNOLOGIES SECURITIES LITIGATION.**

**This Document Relates To:**
**ALL ACTIONS**

Nos. C–84–20749 RPA, C–84–20758 RPA, C–84–20789 RPA, C–84–20801 RPA, C–84–20803 RPA, C–84–20804 RPA, C–84–20816 RPA, C–85–20009 RPA, C–85–20129 RPA and C–85–20130 RPA.

United States District Court,
N.D. California.

Nov. 22, 1988.

Milberg Weiss Bershad Specthrie & Lerach, John E. Grasberger, William S. Lerach, Blake M. Harper, San Diego, Cal., Barrack Rodos & Bacine, Leonard Barrack, Gerald Rodos, Edward M. Gergosian, Philadelphia, Pa., Cohen, Milstein & Hausfeld, P.C., Washington, D.C., Phillip M. Katz, Looney & Grossman, Boston, Mass., for plaintiffs.

Petit & Martin, Michael F. Perlis, Philip F. Atkins–Patterson, Pamela J. Roberts, Alvin L. Fishman, San Francisco, Cal., for Convergent Technologies, Merrill E. Newman, Allen H. Michels, Robert A. Garrow, William R. Harris and Richard E. Meise.

Douglas M. Schwab, Lawrence W. Keeshan, Richard S. Dangerfield, Jane W. Ellis, Heller, Ehrman, White & McAuliff, San Francisco, Cal., for Thomas J. Cable, John Freidenrich, W. Charles Hazel, Jerome Jacobson, Richard Riordan, William Rollnick and A. Robert Towbin.

Pillsbury, Madison & Sutro, William I. Edlund, Walter J. Robinson, III, William O. Fisher, San Francisco, Cal., for: Underwriters defendants.

Robert T. Russell, Ware, Fletcher & Freidenrich, Palo Alto, Cal.

Steven M. Schatz, Bruce G. Vanyo, Terry Johnson, Daniel J. Bergeson, Wilson, Sonsini, Goodrich & Rosati, Palo Alto, Cal., for Unisys Corp.

Lawrence B. Pedowitz, Wendy P. Rosenthal, Wachtell, Lipton, Rosen & Katz, New York City, for Burroughs Corp.

Thomas K. Bouke, Bruce A. McDermott, Riordan, Caps, Carbone & McKinzie, Los Angeles, Cal., for Carbone and McKinzie.

### ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

SPENCER WILLIAMS, District Judge.

On October 11, 1988, defendants in this federal securities class action moved for summary judgment on a variety of grounds. Because this court holds that the statements in question are not materially misleading, summary judgment is GRANTED for all defendants.

BACKGROUND:

This is a class action brought on behalf of all persons who purchased the stock of Convergent Technologies, Inc., (hereafter "Convergent"), between March 17, 1983, the date of Convergent's second public offering, and February 17, 1984, the day following significant disclosures by Convergent at a meeting of securities analysts. The defendants in this action can be broken down into four groups: 1) the "Convergent" defendants, including the corporation itself and five officers of Convergent[1], 2) the outside director defendants, 3) the underwriter defendants, and 4) Unisys Corporation, which was formerly Burroughs Corporation (hereafter "Burroughs"), Convergent's largest customer. In addition to their federal securities fraud claims under Rule 10b–5, plaintiffs also have a pendent state claim for negligent misrepresentation.

The gist of plaintiffs' claims is that defendants misrepresented the business prospects for Convergent's existing line of computer workstation products, the IWS and AWS, demand for which defendants allegedly knew was declining precipitously, particularly from defendant Burroughs. At the same time, plaintiffs contend, defendants concealed from the public severe production and profitability problems with two of Convergent's new product lines under development, NGEN and Workslate, which products defendants falsely represented would continue the Company's explosive growth and profitability.

All the different groups of defendants move for summary judgment. The outside director defendants, the underwriter defendants, and Burroughs all move for summary judgment based on arguments that they, as a specific type of defendant, are not liable for the alleged misrepresentations under any of plaintiffs' theories.[2] In addition, the outside directors move for partial summary judgment based on the preclusive effect of the relevant statute of limitations. However, the court declines to address these arguments as it concludes that the statements in issue here are not misrepre-

---

**1.** These five officers are president, chief executive officer and director Allen Michels; vice president and director Robert Garrow; vice president William Harris; vice president Merrill Newman, and vice president Richard Meise.

**2.** The one exception is that plaintiffs also claim that the underwriter defendants *themselves* made some misrepresentations in research reports that they, the underwriters, actually prepared. *See* Part II.B, *supra*.

sentations, thereby mooting the duty issues and the statute of limitations question.

DISCUSSION:

## I. The Legal Standard

■ No misrepresentation or omission is actionable under federal securities laws unless it involves a *material* fact. *Caravan Mobile Home Sales, Inc. v. Lehman Brothers Kuhn Loeb, Inc.*, 769 F.2d 561, 564 (9th Cir.1985). In order for an omitted fact to be material there must be "a substantial likelihood that a reasonable shareholder would consider it important in deciding whether to sell his shares." *Grigsby v. CMI Corp.*, 765 F.2d 1369, 1372 (9th Cir. 1985) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). This standard contemplates:

> a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberation of the reasonable shareholder. Put another way, there must be a substantial likelihood that disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of the information made available.

*TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132. (Footnote omitted).

■ In order to grant a defendant's motion for summary judgment on the issue of materiality, the court must engage in a "fact-specific inquiry." *Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 985–86, 99 L.Ed.2d 194 (1988). Only upon such a careful examination can the "delicate" assessment of materiality be made. *Id.*

## II. Analysis

### A. The Convergent Defendants' Motion

Plaintiffs base their claims in this action on a "fraud on the market" theory. By this theory, plaintiffs allege indirect reliance on defendants' alleged misrepresentations: they claim they relied on the price that the market established based on *all* public information regarding the value of Convergent's stock. *See Basic Inc. v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 988–89, 99 L.Ed.2d 194 (1988).

Defendants, for their part, claim that they did make disclosures, that whatever they did not disclose was trivial, and that the facts claimed to have been misrepresented or omitted were matters of public knowledge.

In their response to defendants' interrogatories, plaintiffs identified no less than seventy-seven statements which they allege are misrepresentations, virtually every statement made by Convergent during the class period. In their moving papers, the defendants tried to distill the case down to eighteen "central" statements and promised that they would address plaintiffs' minor statements later, should it become necessary. However, plaintiffs in their opposition did not choose to defend these eighteen misrepresentations by methodically examining each statement one by one, but rather used a scattergun approach and stated generally what facts were omitted without linking them to any particular statement. Therefore, for an organizational background, this court considered the four basic arguments made.

1. Lack of disclosure of Burroughs' revision in its forecasts for 1983 workstation orders

■ Plaintiffs contend that certain statements in Convergent's March 1983 Prospectus relating to sales of its current products, the IWS and AWS workstations, were misleading because Convergent did not disclose the existence of a "trend" of declining sales of these products.

Plaintiffs point to the reduction by Convergent's major customer, Burroughs, in its forecasts for 1983 workstations as proof of this trend.[3] Plaintiffs claim that defen-

---

**3.** Plaintiffs also claimed at oral argument that Burroughs' reduction in its forecasts makes a February 14, 1983 press release statement that there was a "continuing greater acceptance of the Convergent product line" blatantly false. This court disagrees. The statement was made prior to the beginning of the class period which commences with the March 1983 public offering. In the March 1983 prospectus Convergent stated that 1983 would be a year of transition from old to new products. Thus, any reasonable investor would conclude that the "continu-

dants knew prior to March 1983 that customers were reducing their quantity commitment in part because the customers feared the impact on sales of the existing IWS and AWS workstations by the introduction of Convergent's new line of "more powerful, less expensive" NGEN workstations.

Defendants make several persuasive counter-arguments. First, they point out that, far from there being a trend of declining sales of its IWS and AWS workstations, sales of these products showed a dramatic increase in 1983 as compared with 1982. Convergent doubled its sales of AWS workstations, and IWS workstations sold increased from 4486 to 5444. Thus to the extent the statements in the March Prospectus implied continuing growth in sales of Convergent's existing products, they were accurate.

Second, defendants point out that the March Prospectus describes 1983 as a "transition" year, that although Convergent would continue to market its existing IWS and AWS products, it was developing the "more powerful and less expensive" NGEN line of workstations, and *that this transition to new products and markets presented a "substantial marketing" risk.* Securities analysts recognized the fact of this transition, even before the March Prospectus came out, and discussed the *replacement* of the AWS line and the fact that "[i]n anticipation of the next generation of products, it is possible that ... major new customers may defer taking delivery of current products in favor of the new line." (Robertson, Colman & Stephens' February 3, 1983 research report at 11–12). On August 8, 1983, Convergent issued a press release stating that revenues and earnings in the second half would be disappointing "because of customer anticipation of deliveries of its new generation of products...." Between the March Prospectus and the August press release,

several different security analysts reported on the risks to Convergent's 1983 sales of its existing workstations.

Third, as defendants point out, Burroughs' estimate of 30,000 workstations was never publicly disclosed so there was no need to correct publicly disseminated misinformation.

This court finds it hard to believe that any investor in the computer industry doesn't know that transitions from old to new products are both commonplace and necessary for continued success and that obsolescence of old products is a reality. The change in Burroughs' 1983 forecast reflected no more than its desire to make the transition from first to second generation workstations—precisely the situation described by Convergent in the March prospectus. It was not a fundamental change in the relationship of the two companies. Therefore, this court holds that Convergent was not required under federal securities laws to disclose Burroughs' revision of its forecasts.

**2. Specificity of the Disclosures of the NGEN risks**

Plaintiffs also claim defendants did not disclose all the difficulties they were having with the new NGEN line. Plaintiffs argue that "from its inception, the NGEN project was beset with profit difficulties, caused in large part by the one-sided negotiations with Burroughs, and it was apparent to defendants that Convergent's NGEN cost targets and profitability would not be achieved." Plaintiffs support this contention by referring to an internal memo circulated on February 21, 1983, by NGEN project director Mike Ramsey in which he noted that the projected 1984 NGEN costs would leave the company with no profit and asked for ideas to reduce costs.

However, the March Prospectus is replete with disclosures about the risks involved with NGEN. In that prospectus

---

ing greater acceptance" of Convergent's product line would be tempered by the natural inclination of customers to wait for the new replacement product rather than purchasing the soon to be obsolete present equipment. Such a tendency does *not* show a declining acceptance of Convergent's product line as a whole, but rather a desire to remain state-of-the-art. Therefore, this court finds that no reasonable juror would find the February 14, 1983 statement misleading.

Convergent made the following statements: 1) "The Company is undertaking substantial development, manufacturing and marketing risks;" 2) "There can be no assurance that the Company will successfully complete the development of its new products, or that it will be successful in manufacturing the new products in high volume or marketing the products in the face of intense competition;" 3) "Lack of availability of components from sole or limited sources would have a temporary adverse affect on the Company by delaying shipments;" 4) "While the Company believes that the technical risks in the development of NGEN are well controlled, *the product costs objectives are very aggressive and there is no assurance they can be achieved.*" (Emphasis added.)

In addition, in the August 1983 Prospectus Convergent made the following statements: 1) "The[ ] risks [involved with NGEN] relate to the completion of the new products in accordance with their technical specifications, the availability of advanced components critical to high volume production of the new products and the achievement of product cost objectives;" 2) "As a result of these risks, the new product areas may not contribute to revenues within the time periods the Company anticipates;" 3) "There is no assurance that the aggressive cost objectives for these products can be achieved, nor is there assurance of the availability of necessary quantities of disk drives or the advanced microprocessors necessary to permit timely production of these products;" 4) "NGEN's microprocessor, which to date has only been manufactured in limited quantities, is being allocated by its sole source manufacturer."

Plaintiffs argue that these statements in the two prospectuses were misleading because the improvement in Convergent's NGEN margins was futile. Plaintiffs claim that these generalized risk disclosures were insufficient in light of defendants' specific knowledge of the cost crisis and scarcity of critical components. However, defendants' evidence, including the declarations of each of the Convergent defendants and the final version of the Con-

vergent 1984 business plan, indicates that Convergent was making every effort to reduce costs and improve margins and that no one thought improvement in margins was futile.

Most telling, however, is the fact that Convergent followed through on the estimates in the March Prospectus. Volume shipments were targeted for the first half of 1984; by the end of the second quarter, Convergent shipped 18,597 NGEN systems. The projected shipments for the year was 72,121; 71,000 were actually shipped. Projected first quarter margins were 14.8; actual margins were 17.1. Projected first half margins were 13.4; actual margins were 18.2.

Therefore, this court holds that the disclosures that Convergent did make regarding the NGEN risks were sufficient under federal securities laws.

3. Specificity of Disclosures of the Worklate Risks

Plaintiffs make the same basic arguments about defendants' alleged failure to disclose the risks with Convergent's new Worklate laptop computer as they did with the alleged failure to disclose the NGEN risks. Plaintiffs claim that early in the class period, Convergent had only a minimal understanding of what the Worklate product was to be, how it would be manufactured, what it would cost, and to whom it would be sold. Plaintiffs contend, therefore, that defendants had no basis for disclosing the product's existence absent full and complete disclosure concerning "the huge obstacles to be overcome before the product could succeed."

In the March Prospectus, Convergent made the same risk disclosure statements for Worklate as it did for NGEN. Between March and August, the product definition for Worklate had been decided upon, prototype units were constructed, retail sales had been decided upon as the initial channel of distribution, and the product had been introduced. In the August Prospectus, updated disclosures concerning Worklate (now called "Ultra") were made as follows: 1) "For Ultra, risks also include the implementation of advanced manufac-

turing processes and the development and management of retail distribution channels;" 2) "The successful volume production and sale of Ultra will be dependent upon the timely availability of several advanced components (some of which have not been manufactured by their suppliers in volume to date), the implementation by the Company of advanced manufacturing processes ... and the development and management by the Company of retail channels of distribution, an area in which the Company has no prior experience;" 3) "The Company has not manufactured its new products in volume.... All of the Company's products use new components based on advanced technology. Many of these new components have yet to be manufactured in volume by their suppliers. The Company's ability to manufacture these products may be adversely affected by the inability of the Company's vendors to supply high quality components in adequate quantities;" 4) "In light of the complex nature of the manufacturing process of its new products, the Company may experience unanticipated problems in their manufacture. One of these, Ultra, will use advanced manufacturing processes which have not to date been widely used in the United States."

Stock analysts recognized the risks involved with Workslate/Ultra. In its May 23 research report, Cowen Institutional Services observed that Workslate was the "gamiest of the major product efforts." Sutro & Co.'s June 28 research report noted the "relatively greater risks" involved with Workslate as did the August 29 Dillon Read Technology research report.

The ultimate irony is that Workslate was discontinued in June 1984 *not* because Convergent was unable to manufacture sufficient quantities of the product beginning in the first quarter of 1984, but because Convergent was unable to *sell* sufficient quantities of the machine. Therefore, plaintiffs' arguments that Convergent failed to disclose with the requisite specificity the production risks of Workslate have arguably little or nothing to do with the failure of the product and the resulting link to drops in Convergent stock prices.

4. Consideration of the Other Information Available to the Public

In support of their summary judgment motions, defendants submitted 63 research reports (including many written by non-defendant underwriters) and articles from the trade and financial press which analyzed Convergent's business, products, strategy, and competitive environment. The analysts reported on the continuing pressure on Convergent's margins, resulting from price concessions granted to Burroughs; competitive product offerings, and the anticipation of the new NGEN workstations. The following is a representative sample: "Convergent must collect on all its new product bets to pull off its aggressive game plan" (Growth Prospects Report); Convergent listed as one of the ten most vulnerable companies monitored by the *California Technology Stock Letter,* (May 11–15, 1983); recommendation of Crowell, Weedon & Co. that their investors sell their Convergent stock due to risks involved with new products (August 12, 1983). In addition, there were a plethora of stock analyst reports discussing costs and margins throughout the class period.

Convergent argues that these reports comprise part of the "total mix" of information available to the investor, and thus must be considered in a "fraud on the market." Plaintiffs, on the other hand, argue that there is a distinction between information disclosed to the market by an issuer, as opposed to third parties such as security analysts.

To support their contention, plaintiffs cite a 1988 New Jersey district court case in which the court stated that "[e]ven if some curative information were available to the public, that would not eliminate the alleged misrepresentations that had also been disseminated." *In re Western Union Securities Litigation,* 120 F.R.D. 629, [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) paragraph 93,779 (D.N.J.1988). Even if this case were binding authority in this district, it would be distinguishable. This is not a case where the misrepresentations need to be *corrected.* The investors are not going to wonder which of two *con-*

*tradictory* statements, one from the stock issuer and one from an analyst, they should believe. Rather, the statements simply supplement the risk disclosures already made by Convergent. This situation is not analogous to that in *Hughes v. Dempsey–Tegeler & Co., Inc.* 534 F.2d 156, 176 (9th Cir.1976), where the Ninth Circuit held that even a "complete disclosure" by a third party may not suffice if the issuer simultaneously discloses false or misleading data which causes the investor to discount the accurate third party disclosures. It can hardly be said that anything Convergent was saying would cause investors to discount the consistent statements coming from the stock analysts reports.

In fact, the Supreme Court has recently stated that disclosures from "market makers" can rebut the "fraud on the market" presumption of reliance by the plaintiffs on defendants' misrepresentations. In *Basic Inc. v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 992, 99 L.Ed.2d 194 (1988), the Court held that

> if 'market makers' were privy to the truth ..., the market price would not have been affected by the [ ] misrepresentations [and] the causal connection could be broken: the basis for finding that the fraud had been transmitted through the market price would be gone.

■ In conclusion, this court holds that Convergent disclosed, securities analysts disclosed, and the federal securities laws provide no protection for the investor who failed to realize the risks which were all too obvious. Therefore, the Convergent defendants' motion for summary judgment, in which the other defendants join, is hereby GRANTED.[4]

**B. The Underwriter Defendants' Motion[5]**

■ Plaintiffs want to hold the underwriter defendants liable for making false and misleading statements in the March Prospectus and subsequent research reports. This court has held that the statements in the March Prospectus were not misleading. As far as the research reports, plaintiffs seek to impose liability based upon portions of these reports that: (1) predict Convergent's future earnings and prospects; (2) offer opinions concerning the initial market reaction to Convergent's new products and their risks and future success, and (3) predict sales and margins for Convergent's existing products. However, the "statements" in the reports that plaintiffs challenge are opinions and predictions which unquestionably have a sufficient factual and/or historical basis so that Rule 10b–5 liability cannot be imposed on the underwriters. *Meier v. Texas International Drilling Funds, Inc.,* 441 F.Supp. 1056, 1063 (N.D.Cal.1977). Convergent had had remarkable growth with its products up until the NGEN and Workslate lines, and there was ample reason to predict that Convergent would have continued success with its equipment. Similarly, in Judge Aguilar's *In re Apple Computer Securities Litigation,* 672 F.Supp. 1552, 1566 (N.D.Cal.1987), a statement by Apple Computer that it did not foresee " 'any trouble selling all [of a new computer] we can build' " had a sufficient historical basis so that summary judgment was granted on a Rule 10b–5 claim because "as a historical fact, Apple had never been unable to sell its product." Furthermore, as the underwriter defendants show, other research reports around the same time were making similar predictions, *some more optimistic.* For example, in January 1984, Smith Barney and Drexel Burnham made earnings estimates above those of the defendant underwriters. Therefore, the underwriter defendants' motion for summary

---

**4.** This court also GRANTS defendants' motion for summary judgment on the pendent state claim as the tort of negligent misrepresentation requires the making of a *false* statement or assertion. *Carroll v. Gava,* 98 Cal.App.3d 892, 159 Cal.Rptr. 778 (1979).

**5.** As discussed above, as this court holds that the statements themselves are not actionable, the question of who is responsible for them is not legally significant. Therefore, with the exception of the issue of the allegedly misleading nature of the research reports put out by the underwriter defendants, the motion for summary judgment of the outside director defendants, the underwriter defendants, and Burroughs are mooted.

judgment on the Rule 10b–5 claims is GRANTED.[6]

CONCLUSION:

Summary judgment is GRANTED for all defendants on the federal securities claims as none of the statements were materially misleading and the underwriters' statements in the research reports were reasonably based on Convergent's history. Summary judgment is GRANTED on the negligent misrepresentation claims because the statements were not misrepresentations and because the underwriters' statements in the research reports were not negligent as a matter of law.

IT IS SO ORDERED.

---

6. In addition, summary judgment is granted for the underwriter defendants on the negligent misrepresentation claim as there is no evidence of negligence. There was a sound historical basis for the statements.