OPINION AND ORDER
 

 VanARTSDALEN, District Judge.
 

 A. INTRODUCTION
 

 This is a class action brought under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),
 
 [1]
 
 and rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder.
 
 [2]
 
 From June 22, 1981, to June 25, 1981, the case was tried to the court without a jury. At the close of plaintiffs’ case, defendants moved for an involuntary dismissal of the action pursuant to Federal Rule of Civil Procedure 41(b) on the ground that, upon the facts and the law, plaintiffs failed to
 
 *769
 
 show entitlement to any relief.
 
 [3]
 
 After hearing oral argument on the motion, I recessed the trial and granted the parties additional time to submit supporting and opposing memoranda of law. Upon considering the testimony and exhibits presented at trial, I have weighed the evidence introduced in plaintiffs’ case and determined the relevant facts.
 
 [4]
 

 B. FACTUAL BACKGROUND
 
 [5]
 

 This case involves an alleged violation of rule 10b-5 in connection with the purchase of shares of stock in Rockwood Computer Corporation, a New Jersey corporation (Rockwood).
 
 [6]
 
 On May 11, 1972, the named class representatives, Walter and Muriel Beissinger, husband and wife, purchased 200 shares of Rockwood common stock at $4.50 per share. By order dated July 13, 1976, I certified a class of plaintiffs consisting of all purchasers of Rockwood common stock who bought their shares during the period July 11, 1971, to June 30, 1972.
 

 The defendants are: Rockwood’s corporate successors, Rockwood National Corporation and Rockwood Computer Corporation — both Delaware corporations;
 
 [7]
 
 three individuals who served as Rockwood officers during the class period — James E. Townsend,
 
 [8]
 
 Elliot M. Wiener,
 
 [9]
 
 and Gerald Morris;
 
 [10]
 
 and Peat, Marwick, Mitchell & Co. (PMM) which served as Rockwood’s independent certified public accountants during the 1970-1973 fiscal years.
 

 By March 31,1971, Rockwood was heavily engaged in the leasing of IBM System/360 computer equipment. As of that date, approximately 96% of Rockwood’s stated $158 million computer inventory consisted of IBM System/360 computers and its peripheral equipment. In June, 1970, International Business Machine Corporation (IBM) publicly announced the introduction of two models of a new computer series, IBM System/370. Subsequent IBM announcements and various
 
 Computerworld
 
 articles appear
 
 *770
 
 ing in 1970 and early 1971 reported that the new System/370 line of computer equipment was faster than the System/360 series and provided greater dollar-for-dollar efficiency by reason of an improved cost/performance ratio.
 

 On or about July 11, 1971, Rockwood distributed its Annual Report for the fiscal year ending March 31, 1971. Within this Annual Report, defendant PMM certified without qualification Rockwood’s Consolidated Financial Statements for the 1971 fiscal year. Two portions of Rockwood’s 1971 Annual Report — the President’s Letter and Note 6 to the Consolidated Financial Statements — made reference to the potential impact of IBM System/370 upon Rock-wood’s ability to re-lease its System/360 equipment. The alleged misrepresentations and omissions contained in these two portions of the 1971 Annual Report constitute the basis of the present lawsuit.
 

 C. DISCUSSION
 

 It is well settled that in order to substantiate a claim under section 10(b) and rule 10b-5, “the plaintiff must establish (1) a misstatement or an omission (2) of material fact (3) made with scienter (4) on which the plaintiff relied (5) that proximately caused his injury.”
 
 Huddleston v. Herman & MacLean,
 
 640 F.2d 534, 543 (5th Cir. Unit A 1981) (citations omitted).
 
 See McLean v. Alexander,
 
 599 F.2d 1190 (3d Cir. 1979). Each of these prerequisites will now be discussed in turn.
 

 I.
 
 Misstatements or Omissions
 

 The gravamen of plaintiffs’ case is that defendants violated rule 10b-5 because of false and misleading statements and omissions of material fact in Rockwood’s 1971 Annual Report.
 
 [11]
 
 Specifically, plaintiffs allege that the misstatements and omissions were contained in the following four segments of the Annual Report, the first two of which appeared in the President’s Letter on page two of the Annual Report, and the second two of which appeared in Note 6 to Rockwood’s Consolidated Financial Statements on page thirteen of the Annual Report:
 

 As you know, IBM has introduced a new series of computers called System/370. These new and faster computers are beginning to be installed in many locations here and abroad. While System/370 is faster in its computer speed and offers larger memories and storage devices than System/360, it is also more expensive. Thus a dilemma may confront all prospective System/370 users; faster speeds at greater costs.
 

 While we cannot fully assess the impact of System/370 computer systems, we do not now expect that this new arrival will cause significant decreases in our present rentals.
 

 The Company may find it necessary to further revise present rates of depreciation if future technical developments adversely affect the useful lives of its computer equipment.
 

 After giving consideration to current technical developments, including the recently announced IBM System/370 series of computers, the Company believes its present depreciation policy is adequate and that it will continue to lease its equipment on terms which will not adversely affect future operations.
 

 Concerning the first segment (hereinafter referred to as Statement No. 1), plaintiffs maintain that this portion of the Annual Report misstated and omitted material facts because, by stating categorically that the System/370 was more expensive, Statement No. 1 failed to specify that the new system was not more expensive when considered in the light of its improved cost/performance ratio. In other words, plaintiffs contend that, although the initial
 
 *771
 
 cost of System/370 equipment was greater than that of System/360 equipment, the new system operated with greater efficiency since it provided more throughput (amount of material processed in a specific time) per dollar of computer cost. To support this contention, plaintiffs cite (1) a memorandum prepared by PMM’s Management Consulting Department (hereinafter referred to as the Goldberg Memorandum),
 
 [12]
 
 (2) the testimony of plaintiffs’ computer expert, Paul Winsor, III, and (3) various
 
 Computerworld
 
 magazine articles and IBM announcements which appeared in 1970 and early 1971
 
 [13]
 
 — the sum of which plaintiffs contend leads to the conclusion that in June, 1971, the computer leasing industry expected the System/370 to provide an improved cost/performance ratio. In essence, therefore, plaintiffs argue that it was misleading for Rockwood’s 1971 Annual Report to state without qualification that the System/370 was more expensive and that a dilemma existed for all users—
 
 i.e.,
 
 faster speeds versus higher costs — when in fact the industry was of the opinion that users
 
 who needed greater computer capacity
 
 would not experience higher costs with the new system.
 

 Defendants, on the other hand, vigorously maintain that this segment of the Annual Report contained no misstatements or omissions of material fact because (1) for users who did not need greater performance, the new system would indeed be more expensive, and (2) at the time the President’s Letter appeared, there was no concrete proof and no general consensus of opinion in the industry that the System/370 was actually more efficient. Thus, defendants argue, the President’s Letter did not omit a material “fact” because it was not then an established “fact” that System/370 was more efficient and would be less expensive for all users. Indeed, defendants are correct in asserting that some users would find the System/370 more expensive
 
 [14]
 
 and that no tangible proof of the new system’s improved efficiency existed in early July, 1971.
 
 [15]
 

 Plaintiffs counter this argument by asserting, in effect, that by March, 1971, it was a fact that IBM and other credible sources had made reliable claims about System/370’s improved cost/performance ratio which engendered uncertainty in the industry about Rockwood’s ability to re-lease its 360 equipment. While it is a close question,
 
 [16]
 
 I conclude that the President’s Letter was misleading to the extent that it suggested the System/370 would cost more for
 
 all
 
 users when there was reliable evidence that it might prove less expensive for users who needed greater performance and capacity. In order to have avoided providing such a misleading suggestion, Statement No. 1 should have warned of the possibility that for some users the new system would not necessarily be more expensive and would not necessarily result in the dilemma articulated in the President’s Letter.
 

 
 *772
 
 With respect to Statements Nos. 2, 3, and
 
 4 supra,
 
 plaintiffs contend that these assertions were false and misleading and contained important omissions of material fact because they misled readers into believing that Rockwood’s leasing operations would not be adversely affected by the introduction of System/370 when, at the time these statements were released, there existed abundant information establishing that the new system would have and was having a significant adverse impact upon Rockwood’s ability to re-rent 360 equipment.
 
 [17]
 
 In support of this argument, plaintiffs cite the testimony of Paul Winsor, III, who opined at the trial that, given the information available in the twelve months preceding June of 1971, it was evident that the introduction of System/370 would have an adverse impact on Rockwood’s operations.
 
 [18]
 
 Plaintiffs place even greater reliance upon the testimony of their accounting expert, Daniel Zalles, who testified that these statements of management’s expectations as to future operations were misleading because management “was in a position to know or to indicate that there was anticipated a significant [adverse] impact,”
 
 [19]
 
 and because the statements omit reference to the problems Rockwood was already experiencing in leasing its 360 computer equipment.
 
 [20]
 

 The basis for Zalles’ opinion was his analysis of various PMM work papers prepared for PMM’s audit of Rockwood’s financial statements for the fiscal year ending March 31, 1971. According to Zalles, the work papers “seem to indicate” that, as of March, 1971, the introduction of System/370 “tended to adversely affect useful lives of the computer equipment.”
 
 [21]
 
 To support his conclusion that Rockwood’s ability to re-rent 360 equipment had
 
 already
 
 been adversely affected by the introduction of System/370, Zalles relied on PMM work papers which revealed the following information: (1) Rockwood’s monthly income had declined during the fiscal year ending March 31, 1971. (Plaintiffs’ Ex. P-18); (2) in fiscal year 1971, there was an increase in the amount of Rockwood’s computer equipment off-rent and fifty percent'of such off-rent equipment was uncommitted (Plaintiffs’ Exs. P — 18, P-19, P — 20; (3) although there was no concrete and tangible evidence of an obsolescence problem, 360 equipment was becoming more difficult to lease and released equipment was producing a lower rental (Plaintiffs’ Ex. P — 23)—in fact, “360 equipment rentals fell by an average of 2 or 3% — a small drop which was also noted [in fiscal 1970]” (Plaintiffs’ Ex. P-30); (4) with respect to certain types of Rockwood’s 360 equipment, it was observed that “accelerated depreciation may be necessary” (Plaintiffs’ Ex. P — 29); and (5) during fiscal 1971, a negative change had occurred in Rock-wood’s customer position (Plaintiffs’ Exs. P-2, P-14, P-16).
 

 This evidence does indicate that the introduction of System/370 may have played a part in causing some of the financial problems which Rockwood experienced in fiscal 1971. Plaintiffs have, however, offered no satisfactory proof that Rock-wood’s financial difficulties were caused solely, primarily, substantially or proximately by the new system. Plaintiffs’ Exhibit P-18, for instance, lists the following factors as causes for the decrease in Rock-wood’s income: (1) obsolescence, (2) renewals and re-lease, (3) contractual decrease, (4) market conditions, (5) IBM policy (including “Popularity of 370 Systems”), (6) peripheral equipment, and (7) “others.” Plaintiffs’ Exhibit P-14 notes that Rockwood was “ex
 
 *773
 
 periencing fierce competition from other leasing companies.” Further, Plaintiffs’ Exhibit P-30 enumerates the following reasons for the decrease in System/360 rentals: “(1) Equipment is a year older[;] (2) Highly competitive state in computer leasing market[;] (3) Renegotiation of expiring leases . . . . ” Given these numerous factors contributing to the Company’s problems, Rock-wood’s management may have been completely justified in believing that, if some of these other underlying causes could be adequately dealt with, Rockwood’s financial difficulties would be eliminated notwithstanding the introduction of System/370. Thus, the testimony of Zalles concerning Rockwood’s
 
 already existing
 
 financial problems fails to convince me by a preponderance of the evidence that Statements Nos. 2 and 4, which express management’s belief that System/370 would not cause significant adverse consequences to Rockwood’s operations, were false or misleading.
 

 To substantiate his opinion that Rock-wood would inevitably experience
 
 future
 
 difficulties in leasing 360 equipment, Zalles pointed to the Goldberg Memorandum which stated that “[t]he introduction in 1970 of IBM’s new 370 computer line will seriously affect the marketability of 360 equipment even at a reduced rental figure.”
 
 [22]
 
 The Goldberg Memorandum further stated:
 

 [I]t is our belief that as we move deeper into the 1970’s it will become more difficult to lease 360 equipment' and the equipment leased will produce less profit. Largely, this will occur because of the introduction of new equipment offering greater throughput per dollar and new concepts in computer utilization.... We do not believe these problems will seriously affect the Levin-Townsend operation during calendar 1971, though we would expect to see a continued build-up of off-rent equipment and a continued decline in revenue from leased computer equipment. We would expect these negative aspects to develop slowly during calendar 1971 as IBM begins to deliver 370 equipment and accelerate during calendar 1972 as the 370 gains wider acceptance. Present software technology will also impede rapid movement from 360 to 370 during calendar 1972, but this deterrent should lessen as years pass during the 1970’s.
 

 As the Goldberg Memorandum also makes clear, “[t]he reliability of these conclusions are [sic] limited since they are based on only two years of statistical data and intangible market conditions.” Defendant PMM is correct in asserting that “[t]he adequacy of disclosure in the challenged portions of the 1971 Annual Report can only be judged fairly in the context of what was known about System/370 at the time the statements in question were made — and
 
 not
 
 on the basis of ten years of hindsight.”
 
 [23]
 
 The conclusions of both Winsor and Zalles that System/370 would adversely affect Rockwood’s future operations are undermined by the fact that in June, 1971, the true performance capabilities of System/370 could not be readily assessed. Plaintiffs’ Exhibit P-23 (PMM work paper) states that, at the time Rockwood’s 1971 Annual Report appeared, it was impossible to provide “concrete and tangible evidence of [an] obsolescence problem” with the 360 equipment. Zalles testified: “[U]ntil the [370] equipment had actually been delivered [and] some performances had been able to have been seen, there actually is more conjecture upon what equipment might do or might perform, when and to what extent the impact that might occur . ...”
 
 [24]
 

 Neither Zalles nor Winsor had any idea how many System/370 units had been delivered by June of 1971.
 
 [25]
 
 A few deliveries
 
 *774
 
 had, in fact, been made by June of that year.
 
 [26]
 
 Neither Zalles nor Winsor gave any testimony regarding the proven performance capability of the delivered 370 equipment. Moreover, one of the technical advancements of System/370 which Winsor viewed as very significant — “virtual memory” — was not even announced until August, 1972,
 
 [27]
 
 and was not available on the early 370 deliveries. Similarly, Winsor testified that he had no knowledge of the delivery date of System/370’s “disc drive” — an innovation which IBM had announced was necessary to achieve the new system’s potential throughput specifications.
 
 [28]
 
 Indeed; when asked to reformulate Statement No. 4 in such a way as to make it not misleading, even Zalles himself could not state unequivocably that System/370 would have an adverse impact on Rockwood’s future operations.
 
 [29]
 

 Given this uncertain state of knowledge concerning the performance capabilities of System/370 in June of 1971, other factors known to Rockwood may have convinced its management that the introduction of the new system would not adversely affect the company’s future operations. For example, in the event that the bulk of Rockwood’s customers were of a type that had no need for additional performance capacity, the introduction of System/370 would have had little or no adverse effect upon Rockwood’s operations. Such customers would not be expected to choose to incur increased costs for extra power that was not needed. In spite of the logical conclusion that the impact of System/370 on Rockwood’s operations depended substantially upon whether customers needed greater computer capacity, neither Zalles nor Winsor deemed it provident to study Rockwood’s customer mix or requirements. Likewise, these two experts did not consider it necessary to investigate (1) Rockwood’s computer portfolio, (2) Rockwood’s marketing force, (3) Rockwood’s capability of developing foreign markets for older computer models, (4) Rockwood’s plans to attempt to fulfill the expectations expressed in its 1971 Annual Report, (5) Rockwood’s experience in leasing prior model computers subsequent to the introduction of System/360, or (6) the cost of converting from System/360 to System/370. Such factors might well have influenced and justified the Company’s belief that the introduction of System/370 would not produce a significant adverse impact on Rockwood’s continuing ability to lease System/360 equipment. In light of Zalles’ and Winsor’s failure even to consider these factors, their testimony that Rockwood’s assertion of its expectations in Statements Nos. 2, 3, and 4 were false is not persuasive.
 
 [30]
 

 It is well established that a reasoned statement of opinion or belief concerning future events is not actionable under rule 10b-5 if supported by a sound
 

 
 *775
 
 factual or historical basis.
 
 G & M, Inc. v. Newbern,
 
 488 F.2d 742, 745-46 (9th Cir. 1973);
 
 Connellan v. Himelhoch,
 
 506 F.Supp. 1290, 1298 (E.D.Mich.1981);
 
 Meier v. Texas International Drilling Funds, Inc.,
 
 441 F.Supp. 1056, 1063 (N.D.Cal.1977);
 
 Eichen v. E. F. Hutton & Co.,
 
 402 F.Supp. 823, 829 (S.D.Cal.1975). Plaintiffs have failed to convince me by a preponderance of the evidence that Rockwood’s management lacked a sound factual or historical basis for the Company’s expressed belief that its leasing operations would not be adversely affected by the introduction of System/370. Thus, I find that there were no misstatements or omissions of material facts in Statements Nos. 2, 3, and 4.
 

 2.
 
 Materiality
 

 As the United States Court of Appeals for the Third Circuit has observed:
 

 Under Rule 10b-5, misinformation by misrepresentation or omission is not by itself sufficient; the information in question must be material. The Supreme Court has defined materiality as: “a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder.”
 

 Healey v. Catalyst Recovery of Pennsylvania, Inc.,
 
 616 F.2d 641, 647 (3d Cir. 1980),
 
 quoting TSC Industries, Inc. v. Northway, Inc.,
 
 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Articulating this standard in another manner, to find materiality, “there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the ‘total mix’ of information made available.”
 
 TSC Industries, supra
 
 at 449, 96 S.Ct. at 2132. (footnote omitted).
 

 As explained above, the only misrepresentation appearing in Rockwood’s 1971 Annual Report was Statement No. 1 which suggested that System/370 would be more costly for all prospective 370 users, whereas in 1970-1971 there was good reason to believe that, for users who needed greater performance capacity, the new system would not be more expensive. The reason for my conclusion that Statement No. 1 contained this misrepresentation was the fact that it failed to point out System/370’s announced capability to provide “more throughput per dollar cost.” Such information was revealed by the Goldberg Memorandum. At trial, plaintiffs’ stock market expert, David Schwerin, testified that, if the information in the Goldberg Memorandum had been disclosed to the public, the price of Rockwood stock would have immediately dropped by one-third to two-thirds.
 
 [31]
 
 Schwerin explained that the basis for his opinion was “that there would have been tremendous uncertainty created in the minds of investors as to Rockwood’s earning power and net worth as a result of the disclosure.”
 
 [32]
 
 Upon this evidence, plaintiffs would have me conclude that the misrepresentation contained in Statement No. 1 was material to the investment decision of a reasonable investor.
 

 The contention that the misrepresentation in Statement No. 1 was “material” as that term has been defined by the Supreme Court is entirely without merit. As plaintiffs themselves readily admit, all of the information concerning System/370’s improved cost/performance ratio was well publicized and widely known in the computer industry.
 
 [33]
 
 Thus, there is no substantial likelihood that a reasonable investor would have viewed a disclosure of System/370’s greater efficiency as having significantly altered the “total mix” of information already available.
 

 
 *776
 
 Furthermore, even if Statements Nos. 2, 3, and 4, along with Statement No. 1, contained misrepresentations or omissions, there is no basis for concluding that those statements were material. The gist of plaintiffs’ argument regarding materiality is that, if information concerning the potential adverse impact of System/370 had been disclosed to the public, the price of Rockwood stock would have declined due to the uncertainty created in the minds of investors as to the Company’s earning power and net worth. However, considering the fact that this same information was already available to the public via the various
 
 Computerworld
 
 articles and IBM announcements — as well as via Rockwood’s Form 10-K for the fiscal year ended March 31, 1971, which was filed as a public record with the SEC on July 7, 1971 — it is clear that the market would have already been well aware of any uncertainty concerning the Company’s future.
 
 [34]
 
 Therefore, I find that there was no substantial likelihood that a reasonable investor would have viewed Statements Nos. 1, 2, 3 and 4, either individually or in combination with each other, as having significantly altered the “total mix” of information available to the public. Indeed, given all of the uncertainty among the investing public which already existed regarding the potential impact of System/370’s introduction, one might have expected the price of Rockwood common stock to rise sharply at the time the allegedly reassuring 1971 Annual Report was released — if the encouraging statements contained in that report were truly material. The price of Rockwood common stock did not significantly rise immediately following the release of the 1971 Annual Report,
 
 [35]
 
 lending further credence to the conclusion that these purported misstatements were not material.
 

 3.
 
 Scienter
 

 The third essential element of a cause of action under Rule 10b-5 is “scienter,” defined by the Supreme Court as “a mental state embracing intent to deceive, manipulate, or defraud.”
 
 Ernst & Ernst v. Hochfelder,
 
 425 U.S. 185, 193 n.12, 96 S.Ct. 1375, 1381 n.12, 47 L.Ed.2d 668 (1976). Within the Third Circuit, the standard for scienter includes recklessness which has been defined as
 

 highly unreasonable [conduct], involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
 

 Sharp v. Coopers & Lybrand,
 
 649 F.2d 175, 193 (3d Cir. 1981),
 
 quoting McLean v. Alex
 
 
 *777
 

 ander,
 
 599 F.2d 1190, 1197 (3d Cir. 1979),
 
 quoting Sundstrand Corp. v. Sun Chemical Corp.,
 
 553 F.2d 1033, 1045 (7th Cir.),
 
 cert. denied,
 
 434 U.S. 875, 98 S.Ct. 224, 54 L.Ed.2d 155 (1977).
 

 It has been held that the standard of proof of scienter required in rule 10b-5 actions is the “clear and convincing” evidence test.
 
 Huddleston, supra
 
 at 545-46. Even under the lower “preponderance of the evidence” threshold of proof, however, plaintiffs have failed to convince me that defendants’ conduct was reckless with respect to Statement No. 1. As noted above, the issue of whether Statement No. 1 can even be considered a misrepresentation or omission was a close question bordering on being “a semantic squabble of no legal import.”
 
 [36]
 
 Although circumstantial evidence in this case may be sufficient to raise an inference that Rockwood’s President had knowledge of System/370’s reportedly improved cost/performance ratio,
 
 [37]
 
 Rock-wood’s management may genuinely have believed that Statement No. 1 did provide sufficient information of the greater performance capacity of System/370 since it did disclose the new system’s “larger memories and storage devices” as well as faster computer speeds.
 

 Rockwood’s choice of the words “more expensive” and “greater costs” may have been negligent in failing to specify that, although initial acquisition and rental costs of a 370 model would be greater than a corresponding 360 model, the cost/production or throughput per dollar ratios could be lower on the 370 model. At the very worst, such language was an error in judgment, not rising above negligence, and hence not with the required scienter to be actionable under
 
 Hochfelder.
 
 There is no credible evidence that there was any intent to deceive the shareholders or the investing public or that the statements were made recklessly. Plaintiffs have failed to carry their burden of proof as to the requisite scienter or intent.
 

 Even if Statements Nos. 1, 2, 3 and 4, either singly or in conjunction with each other, constituted material misrepresentations or omissions, plaintiffs have failed to prove that defendants acted with “an extreme departure from the standards of ordinary care.”
 
 Sharp, supra
 
 at 193. As discussed above, at the time Rockwood’s 1971 Annual Report appeared, there was no conclusive evidence, nor even consensus of opinion in the computer-leasing industry, as to what the true impact of System/370 would be.
 
 [38]
 
 Defendants’ conduct cannot be judged with the benefit of ten-years of hindsight.
 
 [39]
 
 In 1971, many factors never investigated by plaintiffs may well have justified Rockwood’s management’s belief that System/370 would not adversely affect the Company’s leasing operations.
 
 [40]
 
 Considering all of the circumstances which may have engendered Rockwood’s expectations as expressed in Statements Nos. 2, 3, and 4, it is clear that plaintiffs have failed to prove by a preponderance of the evidence
 
 *778
 
 that Rockwood’s management lacked a sound factual or historical basis for making the statements in question. Thus, I conclude that plaintiffs .have failed to carry their burden of proving scienter in this case.
 
 [41]
 

 4.
 
 Reliance
 

 Reliance is an essential element of a plaintiff’s action for damages under rule 10b-5.
 
 Sharp, supra
 
 at 186;
 
 Huddleston, supra
 
 at 548. As the
 
 Sharp
 
 court observed:
 

 The obvious reason for this requirement is that a plaintiff in a rule 10b-5 action should not be allowed to recover damages when the defendant’s wrongful action had no relationship to the plaintiff’s loss.... Reliance is therefore one aspect of the ubiquitous requirement that losses be causally related to the defendant’s wrongful acts.
 

 Sharp, supra
 
 at 186 (citations omitted).
 

 Apparently conceding, as the record reveals they must, that there has been no direct evidence that any class member actually relied upon Rockwood’s 1971 Annual Report in purchasing Rockwood stock, plaintiffs have attempted to satisfy the reliance requirement by emphasizing that a presumption of reliance is available in two categories of cases: (1) where the fraud action is based primarily upon material omissions
 
 [42]
 
 and (2) where plaintiffs purchased their stock on the open market and defendants perpetrated a “fraud on the market.”
 
 [43]
 
 As plaintiffs correctly point out, however, part of the rationale of these decisions is that “ ‘materiality rather than reliance’ has become ‘the decisive element of causation.’ ”
 
 [44]
 
 In light of my finding that plaintiffs have failed to prove materiality in this case, there is no merit in plaintiffs’ contention that the reliance requirement has been satisfied through any presumption. Moreover, even if materiality has been established, it is clear that this case does not fit into either of the two situations in which reliance may be presumed.
 

 a.
 
 Omissions cases
 

 In arguing that reliance should be presumed under the established facts, plaintiffs initially rely upon the decision of the United States Supreme Court in
 
 Affiliated Ute Citizens v. United States,
 
 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). There, the Court stated that in cases
 
 “involving primarily a failure to disclose,
 
 positive proof of reliance is not a prerequisite to recov
 
 *779
 
 ery.”
 
 Id.
 
 at 153-54, 92 S.Ct. at 1472 (emphasis added).
 

 Plaintiffs insist that the present action is primarily a nondisclosure case. The proof which was presented at trial, however, requires that I conclude otherwise— i.e., that, although there was some information omitted in the 1971 Annual Report
 
 (e.g.,
 
 the industry’s expectation of System/370’s improved cost/performance ratio), this case involves
 
 primarily
 
 misrepresentations. Unlike the defendants in
 
 Affiliated Ute,
 
 whose nondisclosures were unaccompanied by any representations, here defendants did not “stand mute” in the face of a duty to disclose.
 
 See id.
 
 at 153, 92 S.Ct. at 1472;
 
 Huddleston, supra
 
 at 548. As the testimony of Winsor and Zalles makes clear, plaintiffs’ basic complaint concerning Rockwood’s 1971 Annual Report is that the four statements at issue
 
 misstated the truth.
 
 In essence, these witnesses testified that they found the Annual Report defective for the following reasons: (1) instead of affirmatively stating that System/370 was “more expensive,” the President’s Letter should have stated that the new system was
 
 not more expensive
 
 when one considers its improved cost/performance ratio;
 
 [45]
 
 (2) instead of reading “we
 
 do not
 
 now expect that this new arrival will cause significant decreases in our present rentals,” the President’s Letter should have read “we
 
 do
 
 expect that this new arrival will cause significant decreases in our present rentals”;
 
 [46]
 
 (3) rather than reading “future technical developments,” Note 6 to the Consolidated Financial Statements should have read “current technical developments”;
 
 [47]
 
 and (4) instead of setting forth the Company’s belief that “it will continue to lease on terms that
 
 will not
 
 adversely affect future “operations,” Note 6 should have related that “the company may have to continue leasing, or may continue leasing its equipment on terms which
 
 will or may
 
 adversely affect future operations.”
 
 [48]
 
 Clearly, therefore, the thrust of plaintiffs’ case is that Rockwood’s 1971 Annual Report contained false statements which led plaintiffs to believe that the Company had an optimistic future when in fact it did not. Under these circumstances, the justification for affording a plaintiff the benefit of an
 
 Affiliated
 
 Ute-type presumption of
 
 reliance
 
 — i.e., “that the plaintiff is generally incapable of proving that he relied on a material omission”
 
 [49]
 
 — does not exist. Hence, because it was entirely possible for plaintiffs to have presented positive proof that they did in fact rely upon the statements in the Annual Report, I find no logical reason to apply the
 
 Affiliated Ute
 
 -type presumption in this case.
 
 [50]
 

 b.
 
 “Fraud on the Market” cases
 

 Plaintiffs alternatively argue that proof of reliance is unnecessary because they purchased their stock on the open market and defendants have perpetrated a “fraud on the market,” thereby inflating the price of Rockwood common stock above its true market value. It has been held
 
 *780
 
 that reliance may be presumed where plaintiffs have demonstrated “that defendants’ misrepresentations and omissions were a part of a
 
 common scheme to manipulate the value of stock
 
 and that the defendants’ fraudulent activities caused an artificial inflation of the market value.”
 
 Sargent v. Genesco, Inc., 75
 
 F.R.D. 79, 84-85 (M.D.Fla. 1977) (emphasis added). Stated another way, in order to prevail under this theory, plaintiffs must establish that defendants engaged in “a
 
 comprehensive scheme
 
 to defraud which includes not only omissions and misrepresentations, but substantial collateral conduct as well.”
 
 Competitive Associates, Inc. v. Laventhol, Krekstein, Horwath & Horwath,
 
 516 F.2d 811, 814 (2d Cir. 1975),
 
 citing Schlick v. Penn-Dixie Cement Corp.,
 
 507 F.2d 374, 380-81 (2d Cir. 1974),
 
 cert. denied,
 
 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975) (emphasis added).
 
 [51]
 
 The evidence adduced at trial fails to demonstrate that the allegedly misleading statements in Rockwood’s 1971 Annual Report were part of “a comprehensive scheme to defraud.” Approximately four days prior to the appearance of its 1971 Annual Report, Rockwood filed its 1971 Form 10-K which was a public document of a type often relied upon by investors.
 
 [52]
 
 As noted above, Rockwood’s 1971 Form 10-K reflected the uncertainty concerning the Company’s business and revealed the potential adverse impact which the introduction of System/370 might have upon Rockwood’s future operations.
 
 [53]
 
 Had Rockwood been engaged in “a common scheme to manipulate the value of stock,” surely such information would have been concealed. Therefore, plaintiffs have failed to establish an essential element of the “fraud on the market” theory and, hence, reliance cannot be presumed under that line of cases.
 
 [54]
 

 Under either the “omissions” or the “fraud on the market” decisions, any presumption of reliance which a fact finder may adopt is rebuttable.
 
 See Sharp, supra
 
 at 189;
 
 Huddleston, supra
 
 at 548;
 
 Panzirer v. Wolf,
 
 Fed.Sec.L.Rep. (CCH) ¶ 97,251, at 96,766 (S.D.N.Y.1980);
 
 Greenspan v. Brassier,
 
 78 F.R.D. 130,133 (S.D.N.Y.1978); Sargent,
 
 supra
 
 at 85. Indeed, the presumption that a plaintiff relied upon alleged misstatements or omissions can even be rebutted by a plaintiff’s own testimony.
 
 Panzirer, supra
 
 at 96,766. Here, the testimony of Walter Beissinger makes clear that the named class representatives never saw, or even requested to see, Rockwood’s 1971 Annual Report prior to their purchase of stock.
 
 [55]
 
 Furthermoré, Mr. Beissinger testified that he and his wife
 
 did
 
 rely upon the
 
 *781
 
 recommendation of Mr. Shaw, the comptroller of a client of Mr. Beissinger’s accounting firm.
 
 [56]
 
 Such evidence is clearly sufficient to rebut any presumption of reliance arising in favor of the named plaintiffs and thus, in any event, the Beissingers’ individual claims would have to be dismissed.
 
 [57]
 

 5.
 
 Damages
 

 Plaintiffs have failed to prove that defendants’ conduct proximately caused injury to any of the class members. There can therefore be no finding of liability in this case irrespective of any other failure of proof. As the
 
 Huddleston
 
 court pointed out:
 

 The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment’s decline in value. If the investment decision is induced by misstatements or omissions that are material and that were relied on by the claimant, but are not the proximate reason for his pecuniary loss, recovery under the rule is not permitted.
 

 Huddleston, supra
 
 at 549 (footnote omitted).
 

 In seeking to establish this element of “loss causation,”
 
 [58]
 
 plaintiffs rely upon the testimony of Daniel Schwerin, a registered investment advisor. At trial, Mr. Schwerin opined that, if Rockwood’s 1971 Annual Report had correctly disclosed the potential adverse effects of the IBM System/370 (on Rockwood’s financial future), the immediate impact of such disclosure would have been a one-third to two-thirds decline in the price of Rockwood common stock — i.e., from approximately $6.00 per share to between $4.00 and $2.00 per share.
 
 [59]
 
 Schwerin testified that the reason for the decline would have been “the tremendous uncertainty created in the minds of investors as to Rock-wood’s earning power and net worth as a result of the disclosure.”
 
 [60]
 
 Schwerin testified that, after an initial sharp drop immediately following dissemination of the information that should have been contained in the Annual Report, the price of the stock would have stayed at those lower levels throughout the class period and would have fluctuated in relation to the general market from those lower levels.
 
 [61]
 
 In addition, as plaintiffs have noted:
 

 Schwerin stated that in April, May and June 1972, because the stock price
 
 may
 
 have assimilated some of the announcements of other leasing companies, the decrease might have been slightly less. “My opinion is that it would probably have been lower by perhaps 20 to 60 percent, rather than 33 to 66, somewhere in that magnitude.”
 

 Plaintiffs’ Brief at 40,
 
 quoting
 
 Tr. 430 (emphasis by plaintiffs).
 
 [62]
 
 On the basis of the above testimony, plaintiffs contend that they have met their burden of proving causation of damages to' all members of the class. For the reasons which follow, I cannot so conclude.
 

 The parties do not dispute that section 28(a) of the Securities Exchange Act of 1934,15 U.S.C. § 78bb(a), limits a plaintiff’s
 
 *782
 
 recovery in a rule 10b-5 case to no more than the “actual loss” caused by the defendant’s conduct. What the parties do dispute, however, is the proper method for determining such actual loss. Relying on a paragraph included in Tentative Draft No. 2 of the American Law Institute’s
 
 Federal Securities Code,
 
 plaintiffs maintain that an acceptable measure of damages in a rule 10b-5 class action is the difference between the amount that the buyer paid for his stock and the amount which he received upon its sale.
 
 See
 
 ALI Fed.Sec.Code § 1402(f)(l)(A)(i) (Tent.Draft No. 2 1973). Although some authority exists for the application of this “rescissional” standard in rule 10b-5 cases where there is privity between the purchaser-plaintiff and the seller-defendant, the American Law Institute chose not to inclúde such an alternative method in the final draft of its
 
 Federal Securities Code. See
 
 ALI Fed.Sec.Code § 1702(e) (1980). More recently, the
 
 Huddleston
 
 court criticized the use of the rescissional measure of damages in cases such as this where plaintiffs purchased their shares on the open market because
 

 the rescissional measure permits the defrauded securities buyer to place upon the defendant the burden of any decline in the value of the securities between the date of purchase and the date of sale even though only a portion of that decline may have been proximately caused by the defendant’s wrong. The decline in the value of the securities in this case may have also resulted from other factors like market forces and events unrelated to the deceit that had an economic effect on the enterprise .... Under these circumstances, the rescissional measure is unjust insofar as it compensates an investor for the nonspecific risks which he assumes by entering the market.
 

 Huddleston, supra
 
 at 555 (citations omitted).
 

 As will be made clear in the discussion which follows, the instant case also presents a situation where the rescissional measure of damages would unfairly compensate plaintiffs for losses not caused by the conduct of defendants. Thus, for the reasons enunciated by the
 
 Huddleston
 
 court, I conclude that the traditional out-of-pocket measure of damages is the proper standard for determining actual losses in the case at bar.
 
 See also Sharp, supra
 
 at 190;
 
 In re LTV Securities Litigation,
 
 88 F.R.D. 134, 148 (N.D.Tex.1980).
 

 The “out-of-pocket” loss is the difference between what the buyer paid for his stock and what he would have paid had there been no conduct imposing liability.
 
 Sharp, supra
 
 at 190,
 
 citing with approval Huddleston, supra
 
 at 554-55. In order to establish this differential, it is incumbent upon plaintiffs to provide evidence of the “true value” of the securities for each date on which members of the class purchased during the class period.
 
 Huddleston, supra
 
 at 556.
 
 [63]
 
 Here, however, plaintiffs chose not to so establish this price-“true value” spread; rather, plaintiffs relied upon Schwerin’s testimony that, had proper disclosure been made in Rockwood’s 1971 Annual Report, the price of Rockwood shares would have immediately dropped one-third to two-thirds in value and
 
 “would have stayed at those lower levels throughout [the class period], and moved more in relation to the general market from those lower levels.”
 

 [64]
 
 The trading price of Rockwood stock followed the general stock market price fluctuations throughout the class period. Those members of the class who both purchased and sold during the class period suffered no loss
 
 as a consequence of
 
 defend
 
 *783
 
 ants’ alleged illegal activities.
 
 [65]
 
 This conclusion follows from the fact that such purchases and re-sales would have
 
 both
 
 occurred at prices allegedly inflated by false statements and omissions contained in Rockwood’s 1971 Annual Report. As Judge Sneed of the United States Court of Appeals for the Ninth Circuit has remarked:
 

 Assuming for the moment that the spread [between price and “true value”] remained constant, class member purchasers who sold before disclosure have recovered from the open market the “cost” of the misrepresentations.
 
 To permit such a purchaser-seller to recover this same “cost,”
 
 viz.
 
 the spread between the price and the value lines at the- date of purchase, from the defendant corporation would be to provide him with a double recovery. This is true without regard to whether the price at which he sold was greater or less than that at which he purchased.
 
 Any decline in the market price following purchase, under the assumption of a constant spread, is not attributable to any wrong of the defendant. Its source is market forces unrelated to the misrepresentations.
 

 Green v. Occidental Petroleum Corp.,
 
 541 F.2d 1335, 1345 (9th Cir. 1976) (Sneed, J., concurring) (emphasis added).
 
 See also In re LTV Securities Litigation, supra
 
 at 149.
 

 As the following example helps to illustrate, Judge Sneed’s observations are especially pertinent to the present ease. Assuming that a class member purchased his Rockwood stock in mid-July, 1971, the price of those shares would have been around $5.75 per share whereas their “true value” was approximately $3.75 per share (according to Schwerin’s testimony). Further assuming that the price of Rockwood stock followed the general market trends and that the price-“true value” spread remained constant, if the same class member later sold his stock for approximately $3.00 per share, its “true value” would have been approximately $1.00 per share. Obviously, because he would have received $2.00 per share more than the stock was actually worth at the time of sale, such a class member would have recovered the “cost” of the misrepresentation to him and would therefore have suffered no damages.
 

 It is conceivable, however, that certain class members who purchased their stock between July 11, 1971, and March 31, 1972, and sold it between April 1, 1972 and June 30, 1972,
 
 could
 
 have suffered damages as a result of the alleged misconduct of defendants. Although plaintiffs have not expressly articulated the theory, the rationale behind this possibility is that, by April, 1972, the market may have assimilated news concerning the adverse impact of System/370. Such an occurrence would cause the inflated price of the stock to fall closer to its “true value,” thereby precluding a class member from recovering the entire “cost” of the misrepresentation to him.
 
 See Green, supra
 
 at 1345-46 (Sneed, J., concurring).
 

 To illustrate, if a class member purchased his Rockwood stock in mid-July, 1971, the “cost” of the alleged misrepresentation to him would have been approximately $2.00 per share (according to Schwerin’s testimony). Assuming that the market assimilated news concerning System/370’s adverse impact around April, 1972, a class member who sold his shares at that time might receive only $4.50 per share for stock whose “true value” was $3.50 per share. In this situation, although the class, member would receive $1.00 per share more than the stock was actually worth, he would recover only one-half of the “cost” of the misrepresentation to him and, thus, defendants’ conduct would cause him economic loss.
 

 In the present case, Schwerin did testify
 

 that in April, May and June 1972, because the stock price
 
 may
 
 have assimilated
 
 *784
 
 some of the announcements of other leasing companies, the decrease might have been slightly less. “My opinion is that it would probably have been lower by perhaps 20 to 60 percent, rather than 33 to 66, somewhere in that magnitude.”
 

 Plaintiffs’ Brief at 40,
 
 quoting
 
 Tr. 430 (emphasis by plaintiffs).
 
 [66]
 
 Schwerin’s equivocal testimony, however, has failed to prove by a preponderance of the evidence that any class members suffered damage or are entitled to the benefits of this assimilation theory. Statements such as (1) “the stock
 
 may
 
 have assimilated” information concerning System/370’s impact,
 
 [67]
 
 and (2) the price of Rockwood stock would
 
 “perhaps”
 
 or
 
 “probably
 
 have been lower by
 
 perhaps
 
 20 to 60 percent, rather than 33 to 66,”
 
 [68]
 
 are insufficient bases upon which to establish damages. Moreover, Schwerin’s statement that, during the period April to June of 1972, the price of Rockwood stock would have been inflated by perhaps twenty to sixty percent is inconsistent with his testimony on re-cross examination that he had “no opinion” “as to what would have happened to the stock price if there had been a disclosure of the type [he] said should have been made, at any point in time, other than in July of 1971.”
 
 [69]
 

 Schwerin’s testimony relevant to the assimilation theory is unconvincing for still another reason. It was Schwerin’s opinion that, if the 1971 Annual Report had disclosed the potential adverse impact of System/370, the price of Rockwood stock would have declined due to “the tremendous uncertainty created in the minds of investors as to Rockwood’s earning power and net worth.”
 
 [70]
 
 As noted above, however, a great deal of information concerning the potential adverse impact of System/370 was already available to the investing public well before April, 1972, due to the release of Rockwood's 1971 Form 10-K and the various IBM announcements and
 
 Computer-world
 
 articles prior to that time. Any withheld information which Rockwood might have had an obligation to disclose and which might have created uncertainty in the minds of investors generally may have already been reflected in the market price of Rockwood stock prior to April of 1972.
 

 Finally, plaintiffs made no attempt to quantify with actual dollar figures the “true value” of Rockwood stock for each date on which they sold shares during April through June of 1972. Thus, a critical element of proof is nonexistent here, and I conclude that the assimilation theory of loss causation is not available to plaintiffs.
 
 [71]
 

 In sum, for all the above reasons, I find that plaintiffs have failed to establish that the conduct of defendants proximately caused injury to any members of the plaintiff class.
 
 [72]
 

 
 *785
 
 D. CONCLUSIONS OF LAW
 

 1. This court has jurisdiction over the parties and the subject matter of this action and venue is properly laid in the Eastern District of Pennsylvania.
 

 2. Statement No. 1 in the President’s Letter appearing in Roekwood’s 1971 Annual Report was misleading to the extent that it suggested the System/370 would cost more for
 
 all
 
 users when there was evidence that it might prove less expensive for users who needed greater performance. There were no misstatements or omissions of fact in Statements Nos. 2, 3, and 4 of Rock-wood’s 1971 Annual Report.
 

 3. The misrepresentation in Statement No. 1 was not “material” as that term has been defined by the United States Supreme Court. Likewise, the alleged misrepresentations and/or omissions contained in Statements Nos. 2, 3, and 4 were not “material” under the Supreme Court guidelines.
 

 4. Plaintiffs have failed to carry their burden of proving scienter.
 

 5. Plaintiffs have failed to prove the “reliance” requirement of a rule 10b-5 cause of action.
 

 6. Plaintiffs have failed to establish that the conduct of defendants proximately caused injury to any member of the plaintiff class.
 

 ORDER
 

 Upon careful consideration of defendants’ motion for an involuntary dismissal of this action pursuant to Federal Rule of Civil Procedure 41(b), together with the testimony and exhibits presented at trial, all supporting and opposing memoranda of law, as well as oral argument on the motion, IT IS ORDERED, for the reasons set forth in the accompanying opinion, that defendants’ motion is granted and Civil Action No. 75-2449 is dismissed with prejudice.
 

 [1]
 

 . Section 10(b) provides:
 

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—
 

 (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.
 

 Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976).
 

 [2]
 

 . Rule 10b-5 provides:
 

 It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
 

 (a) To employ any device, scheme, or artifice to defraud,
 

 (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
 

 (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.
 

 17 C.F.R. 240.1Ob-5 (1980).
 

 [3]
 

 . Rule 41(b) provides in pertinent part:
 

 After the plaintiff, in an action tried by the court without a jury, has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.
 

 Fed.R.Civ.P. 41(b).
 

 [4]
 

 . In passing on a rule 41(b) motion, “[t]he court is not to make any special inferences in the plaintiffs favor nor concern itself with whether plaintiff has made out a prima facie case. Instead it is to weigh the evidence, resolve any conflicts in it, and decide for itself where the preponderance lies.”
 
 Sworob v. Harris,
 
 451 F.Supp. 96, 99 (E.D.Pa.),
 
 aff'd mem.,
 
 578 F.2d 1376 (3d Cir. 1978), cert.
 
 denied,
 
 439 U.S. 1089, 99 S.Ct. 871, 59 L.Ed.2d 55 (1979),
 
 quoting
 
 9 A. WRIGHT & C. MILLER, FEDERAL PRACTICE AND PROCEDURE:
 
 Civil
 
 § 2371, at 224-25 (1971).
 
 See also Pan American World Airways, Inc. v. Continental Bank,
 
 435 F.Supp. 642, 643 n.l (E.D.Pa. 1977).
 

 [5]
 

 . The following “FACTUAL BACKGROUND” and “DISCUSSION” sections shall comprise my findings of fact in compliance with Federal Rules of Civil Procedure 41(b) and 52(a).
 

 [6]
 

 . From December, 1963, to October, 1964, Rockwood operated under the name of Levin and Townsend, Inc. That name was changed in October, 1964, to Levin-Townsend Corporation and in August, 1971, to Rockwood Computer Corporation.
 

 [7]
 

 . On August 30, 1972, the assets and business of Rockwood were transferred to defendant Rockwood Computer Corporation in exchange for shares of capital stock of defendant Rock-wood National Corporation. Rockwood was thereafter liquidated and the shares of capital stock of defendant Rockwood National Corporation were distributed to the stockholders of Rockwood, who thereby became shareholders of Rockwood National Corporation. This reorganization was completed on August 8, 1973.
 

 [8]
 

 . During the period January, 1970, to June, 1973, Townsend served as President and Chairman of the Board of Rockwood.
 

 [9]
 

 . During the period January, 1970, to June, 1973, Wiener served in the capacities of Treasurer, Vice-President Treasurer, and Vice-President of Rockwood.
 

 [10]
 

 . Between July 1, 1971, and January 26, 1972, Morris was an Assistant Treasurer and Assistant Secretary of Rockwood. During the period January 20, 1972, to August 30, 1972, Wiener served as Rockwood’s Controller.
 

 [11]
 

 . Defendant PMM maintains that plaintiffs’ complaint fails to allege with adequate particularity the exact theory of plaintiffs’ case as presented at trial. It is beyond dispute, however, that all parties had sufficient and timely notice of the precise nature of plaintiffs’ case and there was no surprise to defendants regarding any significant issue arising at trial.
 

 [12]
 

 .
 
 See
 
 Plaintiffs’ Ex. P-2.
 

 [13]
 

 .
 
 See
 
 Plaintiffs’ Exs. 58-61, 73-79, 81-99.
 

 [14]
 

 .
 
 See
 
 Tr. 54-55, 107-08.
 

 [15]
 

 . Plaintiffs’ accounting expert, Daniel Zalles, testified at trial: “[U]ntil the [370] equipment had actually been delivered [and] some performances had been able to have been seen, there is more conjecture upon what equipment might do or might perform, when and to what extent the impact that might occur . . .. ” Tr. 321-22. Albeit two deliveries of 370 equipment did occur before July, 1971, plaintiffs presented no evidence to show that the improved efficiency of these machines had been clearly demonstrated at that time.
 
 Cf.
 
 note 26 and accompanying text
 
 infra.
 

 [16]
 

 . It is arguable that plaintiffs’ complaint about Statement No. 1 amounts to no more than “a semantic squabble of no legal import.”
 
 Oleck v. Fischer,
 
 623 F.2d 791, 794 (2d Cir. 1980). Rockwood’s management did reveal that System/370 was faster in its computer speed and offered larger memories and storage devices than System/360. Thus, it could be contended that Rockwood did disclose the greater performance efficiency of System/370 and that the phrase “more expensive” was merely meant to convey the fact that the new system would cost more money than the comparable 360 model
 
 in terms of the initial acquisition price.
 

 [17]
 

 .
 
 See
 
 Plaintiffs’ Memorandum in Opposition to Defendants’’ Motion For Dismissal Under Rule 41(b) of the Federal Rules of Civil Procedure at 13-23 (hereinafter referred to as Plaintiffs’ Brief).
 

 [18]
 

 . Tr. 63-65.
 

 [19]
 

 . Tr. 190.
 

 [20]
 

 . With respect to Statement No. 3 in particular, Zalles testified that the use of the phrase “future technical developments” was misleading because it failed to take into account “present” technical developments which made System/370 more cost efficient than System/360. Tr. 193-94, 216-18, 294-97.
 
 See
 
 note 28 and accompanying text
 
 infra.
 

 [21]
 

 . Tr. 194.
 

 [22]
 

 . Plaintiffs’ Ex. P-2.
 

 [23]
 

 . Memorandum in Support of Motion of Defendant Peat, Marwick, Mitchell & Co. for Dismissal Under Rule 41(b) of the Federal Rules of Civil Procedure at 45-46 (hereinafter cited as PMM’s Brief).
 

 [24]
 

 . Tr. 321-22.
 

 [25]
 

 . Tr. 82, 93, 322.
 

 [26]
 

 . The first 370 unit was delivered in February, 1971, and the second model was delivered in April, 1971. Tr. 94-95.
 

 [27]
 

 . Tr. 87-88;
 
 See
 
 Plaintiffs’ Exs. P-61, P-62, P-68..
 

 [28]
 

 . Tr. 99. That the true performance capabilities of System/370 could not be reliably assessed in June, 1971, and that important elements of the new system such as virtual memory had not even been publicly announced by that time, completely vitiate plaintiffs’ arguments that it was misleading for Rockwood to refer to “future technical developments” in Statement No. 3.
 

 [29]
 

 . The pertinent part of Zalles’ proposed reformulation of Statement No. 4 follows: “[T]he company may have to continue leasing, or may continue leasing its equipment on terms which will or
 
 may
 
 adversely affect future operations.” Tr. 297 (emphasis added).
 

 [30]
 

 . For example, Winsor testified that “370 peripheral equipment and 360 peripheral equipment generally speaking were interchangeable.” Tr. 97. The fact that Rockwood’s 360 computer inventory was comprised of a high percentage of 360 peripheral equipment (see Plaintiffs’ Ex. P-12) which could be used with System/370 equipment may indeed have contributed to Rockwood’s belief that System/370 would have no significant impact on its present rentals or future operations.
 

 Similarly, even Zalles testified that Townsend (Rockwood) may reasonably have held the view that the company would be able to expand their leasing portfolio by improved marketing techniques. Tr. 211-12.
 

 [31]
 

 . Defendant PMM argues that there is no foundation upon which this opinion by Schwerin can rest since no witness testified that the Goldberg Memorandum was required to be disclosed to the public. PMM’s Brief at 126. This argument misses the point of plaintiffs’ hypothetical question, however, because Schwerin was not asked to assume that the Goldberg Memorandum had been disclosed; rather, Schwerin was asked to assume the disclosure of “the information contained in [the Goldberg Memorandum].” Tr. 422.
 

 [32]
 

 . Tr. 422-23.
 

 [33]
 

 . Plaintiffs’ Brief at 12-13; Plaintiffs’ Memorandum of Facts at 21-22.
 

 [34]
 

 . In its 1971 Form 10-K, Rockwood stated: During 1970 IBM announced several new products including System/370 computer equipment and certain new peripheral computer equipment. These new computers are faster, have more capacity and are more expensive than the IBM System/360 product line owned by the Company. Although initial deliveries have begun, the impact of this new series of computer systems on the Company’s ability to re-lease its System/360 computer equipment can not be made at this time,
 
 although any impact would be adverse.
 
 In addition, the Company believes that, despite the introduction of new peripheral equipment, the Company’s peripheral equipment can continue to be rented at lower rates.
 

 There are a number of uncertain factors relating to the Company’s business. These factors include (a) uncertainty as to the economic life of System/360 computers in view of the continuing development of computer technology,
 
 (b) the Company’s policy of writing leases which do not recover fully its equipment cost during the fixed term; (c) the Company’s dependence on the availability of future financing on favorable terms; and (d)
 
 competitive conditions prevailing in the industry.
 
 In particular, since the Company rents its equipment at less than the corresponding IBM rentals, reductions by IBM in its rental charges (as well as any changes by IBM in its sales, service or maintenance policies) could have an adverse effect on the Company.
 
 Obsolescense [sic] may also be a significant factor in the Company’s ability to further lease or sell computers in that computer manufacturers continually introduce new products and improvements which cannot generally be installed on older computers.
 

 Plaintiffs’ Ex. P-157 (emphasis added).
 

 [35]
 

 .
 
 See
 
 Plaintiffs’ Ex. P-56A.
 

 [36]
 

 .
 
 See
 
 note 16
 
 supra.
 

 [37]
 

 . Rockwood’s President, James Townsend, stated at his deposition: “Part of our business is to understand the business we are in.” (Townsend Deposition at 66). Since the IBM announcements and
 
 Computerworld
 
 articles indicate an industrywide expectation of improved efficiency with System/370, it is reasonable to infer that Townsend had knowledge of the new system’s reportedly improved cost/performance ratio. Circumstantial evidence is admissible as proof of a defendant’s knowledge or intent in a rule 10b-5 action.
 
 Huddleston, supra
 
 at 546;
 
 McLean, supra
 
 at 1198.
 

 [38]
 

 .
 
 See
 
 Part C.l.
 
 supra
 
 at 776-781. Indeed, when considering the evidence available in 1971, even plaintiffs’ expert, Daniel Zalles, was equivocal in assessing the effect of System/370’s introduction: “[In 1971,] I had an opinion that there
 
 seemed to be
 
 a trend that there
 
 might
 
 be problems within the industry . . . . ” Tr. 283 (emphasis added).
 

 [39]
 

 . As the United States Court of Appeals for the Fifth Circuit has recently stated: “Whether a defendant’s actions in a Rule 10b-5 case violate the standard of care imposed by the Rule, thus establishing scienter, is a question of fact to be determined
 
 as of the time of the actions about which the plaintiff is complaining.” Huddleston, supra
 
 at 546 (citations omitted) (emphasis added).
 

 [40]
 

 .
 
 See
 
 Part C. 1.
 
 supra
 
 at 778-781.
 

 [41]
 

 . Because an accountant may be liable as an aider and abettor for a rule 10b-5 violation only when there is proof that the accountant had
 
 knowledge of the fraud
 
 and not merely knowledge of allegedly undisclosed material facts, plaintiffs’ failure to prove fraud on the part of Rockwood’s management also eliminates plaintiffs’ cause of action against PMM as an aider and abettor.
 
 See Hirsch v. du Pont,
 
 553 F.2d 750, 759 (2d Cir. 1977).
 
 See also Monsen v. Consolidated Dressed Beef Co.,
 
 579 F.2d 793, 799 (3d Cir. 1978);
 
 Seiffer v. Topsy’s International, Inc.,
 
 487 F.Supp. 653, 668 (D.Kan.1980). Moreover, in light of my conclusion that Note 6 to the Consolidated Financial Statements in the 1971 Annual Report contained no misstatements or omissions of material fact, and, in light of my findings concerning reliance and damages
 
 infra,
 
 there is no basis for holding PMM liable as a principal in this case.
 

 [42]
 

 .
 
 See, e.g., Affiliated Ute Citizens v. United States,
 
 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972);
 
 Sharp, supra
 
 at 187;
 
 Huddleston, supra
 
 at 547-48.
 

 [43]
 

 .
 
 See, e.g., Vervaecke v. Chiles, Helder & Co.,
 
 578 F.2d 713, 717 (8th Cir. 1978);
 
 Blackie v. Barrack,
 
 524 F.2d 891, 906-07 (9th Cir. 1975),
 
 cert. denied,
 
 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976);
 
 Panzirer v. Wolf,
 
 Fed.Sec.L. Rep. (CCH) ¶ 97,251, at 97,301 (S.D.N.Y.1980).
 

 [44]
 

 . Plaintiffs’ Brief at 31-32,
 
 quoting Koenig v. Smith,
 
 88 F.R.D. 604 at 607, Fed.Sec.L.Rep. (CCH) ¶ 97,965, at 90,975 (E.D.N.Y.1980),
 
 quoting Titan Group, Inc. v. Faggen,
 
 513 F.2d 234, 239 (2d Cir.),
 
 cert. denied,
 
 423 U.S. 840, 96 S.Ct. 70, 46 L.Ed.2d 57 (1975).
 
 See also Affiliated Ute Citizens v. United States,
 
 406 U.S. 128, 153-54, 92 S.Ct. 1456, 1472, 31 L.Ed.2d 741 (1972) (presumption of reliance applies only if omitted fact was “material”);
 
 Blackie v. Barrack,
 
 524 F.2d 891, 906 (9th Cir. 1975) (reliance may be presumed only where facts misrepresented or omitted were “material”);
 
 Sargent v. Genesco, Inc.,
 
 75 F.R.D. 79, 85 (M.D. Fla. 1977) (same).
 

 [45]
 

 .
 
 See
 
 Tr. 67.
 

 [46]
 

 .
 
 See
 
 Tr. 63-64, 188-90 (emphasis added).
 

 [47]
 

 .
 
 See
 
 Tr. 193-94, 297.
 

 [48]
 

 .
 
 See
 
 Tr. 297 (emphasis added).
 

 [49]
 

 .
 
 Sharp, supra
 
 at 188.
 

 [50]
 

 . As the
 
 Sharp
 
 court remarked: “The plaintiff traditionally assumes the burden of demonstrating causation. ... Only in unusual circumstances is this burden shifted from the plaintiff to the defendant.”
 
 Sharp, supra
 
 at 188 (citations omitted). In cases involving a mixture of misrepresentations and omissions, reliance should be presumed “only ‘where it is logical’ to do so.”
 
 Id., quoting Lewis v. McGraw,
 
 619 F.2d 192, 195 (2d Cir.),
 
 cert. denied,
 
 449 U.S. 951, 101 S.Ct. 354, 66 L.Ed.2d 214 (1980). In the case at bar, the only inherent difficulties which plaintiffs would face in presenting positive proof of reliance are the added expenses and inconveniences of providing individual showings of reliance in a case involving numerous plaintiffs. Such difficulties do not constitute sufficient reason to shift plaintiffs’ traditional burden of proof for, as the
 
 Huddleston
 
 court observed, even “[wrongdoing defendants should not be mulcted to make simple the management of a class proceeding under rule 10b-5.”
 
 Huddleston, supra
 
 at 556,
 
 quoting Green v. Occidental Petroleum Corp.,
 
 541 F.2d 1335, 1343 (9th Cir. 1976) (Sneed, J„ concurring).
 

 [51]
 

 .
 
 See also Blackie v. Barrack,
 
 524 F.2d 891, 894, 905-08 (9th Cir. 1975) (“fraud on the market” theory applied to case involving misrepresentations in numerous annual and interim reports, press releases, and SEC filings);
 
 Greenspan v. Brassier,
 
 78 F.R.D. 130, 133 (S.D.N.Y. 1978) (“fraud on the market” theory requires “comprehensive scheme to defraud”).
 

 [52]
 

 .
 
 See
 
 Tr. 458, 462-64, 471.
 

 [53]
 

 . See note 34
 
 supra.
 

 [54]
 

 . Moreover, the uncertainty concerning Rock-wood’s ability to re-lease 360 computers— which plaintiffs allege should have been reflected in the 1971 Annual Report — -was already apparent to the public through the various
 
 Computerworld
 
 articles and IBM announcements released in 1970-1971. Because the price of a company’s stock “appears to reflect
 
 all
 
 publicly available information,”
 
 In re LTV Securities Litigation,
 
 88 F.R.D. 134, 144 (N.D.Tex.1980) (emphasis added), the market price of Rockwood stock would have already reflected any uncertainty about the Company’s future at the time its 1971 Annual Report appeared. Thus, plaintiffs have failed to prove another element of the “fraud on the market” theory — that the allegedly misleading statements in Rockwood’s 1971 Annual Report actually “caused an artificial inflation of the market value.”
 
 Sargent, supra
 
 at 85.
 

 Note that this conclusion does not amount to just another way of saying that the allegedly misleading statements were not “material.” The question of materiality goes to “transaction causation” — a term “used to describe the requirement that the defendant’s fraud must precipitate the investment decision.”
 
 Huddleston, supra
 
 at 549 n.24. My conclusion here addresses the issue of “loss causation” which “refers to a direct causal link between the misstatement and the claimant’s economic loss,”
 
 id.
 
 (citations omitted), and which the
 
 Sargent
 
 court lists as a separate prerequisite for the application of the “fraud on the market” theory.
 
 See also
 
 Part C.5.
 
 infra.
 

 [55]
 

 . See Tr. 521-22.
 

 [56]
 

 .
 
 See
 
 Tr. 518-19, 520-21, 525.
 

 [57]
 

 .
 
 See Huddleston, supra
 
 at 548;
 
 Greenspan, supra
 
 at 133;
 
 Panzirer, supra
 
 at 96,766. As the
 
 Huddleston
 
 court observed: “If defendant can prove that plaintiff did not rely, that is, that plaintiffs decision would not have been affected even if defendant had disclosed the omitted facts, then plaintiffs recovery is barred.”
 
 Huddleston, supra
 
 at 548,
 
 quoting Rifkin v. Crow,
 
 574 F.2d 256, 262 (5th Cir. 1978). In the present case, even if the 1971 Annual Report had disclosed the allegedly nondeceptive facts, Mr. Beissinger’s testimony makes plain that the named plaintiffs would never have viewed that document and, hence, would never have learned of the information contained therein. Thus, the Beissingers’, decision to buy Rock-wood stock would not have been affected even if the 1971 Annual Report had been prepared differently. It follows, therefore, that the named class representatives are entitled to no relief in this case.
 

 [58]
 

 .
 
 See
 
 note 54
 
 supra.
 

 [59]
 

 . See Tr. 417-22.
 

 [60]
 

 . Tr. 423.
 

 [61]
 

 . Tr. 426.
 

 [62]
 

 .
 
 See also
 
 Tr. 429.
 

 [63]
 

 . As the
 
 Huddleston
 
 court observed, the issue of damages in a rule 10b-5 class action suit is “an individual matter to be determined separately for each member of the plaintiff class.”
 
 Huddleston, supra
 
 at 556.
 
 Accord, Sharp, supra
 
 at 192;
 
 Arthur Young & Co. v. United States District Court,
 
 549 F.2d 686, 696 (9th Cir.),
 
 cert. denied,
 
 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977) (issue of damages in rule 10b-5 class action case is “invariably an individual question”);
 
 Blackie v. Barrack,
 
 524 F.2d 891, 905 (9th Cir. 1975) (same). '
 

 [64]
 

 . Tr. 426 (emphasis added).
 
 See also
 
 Tr. 512-14.
 

 [65]
 

 . Because any shares held by purchasers at the end of the class period were considered by plaintiffs to have been sold on the last day of the class period,
 
 see
 
 Tr. 549-50, this same analysis is equally applicable to those class members who held their shares until after June 30, 1972.
 

 [66]
 

 .
 
 See also
 
 Tr. 429.
 

 [67]
 

 . Tr. 429 (emphasis added).
 

 [68]
 

 . Tr. 429, 430 (emphasis added).
 

 [69]
 

 . Tr. 515-16. I note in addition that Schwerin’s position at trial with respect to the valuation of Rockwood’s stock during April through June of 1972 is also inconsistent with the statements he made at his deposition regarding that period.
 
 See
 
 Tr. 431-36.
 

 I note further Schwerin’s testimony concerning his lack of an opinion as to the price of Rockwood stock at any time other than July, 1971. Plaintiffs have failed to prove any “loss causation” with respect to class members who purchased their shares
 
 after
 
 the beginning of the class period.
 

 [70]
 

 . Tr. 423.
 

 [71]
 

 . In any event, because there is no evidence of a diminishment in the price-“true value” differential between July 11, 1971, and March 31, 1972, members of the plaintiff class who both purchased and sold their shares during that time period may not avail themselves of the assimilation theory. Similarly, the theory is unavailable to class members who both purchased and sold their shares between April 1, 1972, and June 30, 1972, since, again, plaintiffs presented no evidence that the price-“true value” spread converged during that time period.
 

 [72]
 

 . The testimony of plaintiffs statistical expert, Dr. John de Cani, provides no assistance to plaintiffs in their attempt to prove loss causation for, as Dr. de Cani candidly admitted, his statistical analysis of the
 
 amount
 
 of damages did not purport to give any indication of the cause of the losses which he computed. Tr. 554.
 

 Furthermore, I note parenthetically that Dr. de Cani’s statistical analysis — which employed the rescissional measure of damages — proved
 
 *785
 
 at trial to be a seriously flawed method of establishing the amount of losses purportedly suffered by plaintiffs. The many errors contained in Dr. de Cam’s statistical sampling (see Tr. 559-68, 570-83, 591-95) convince me of the inherent unreliability of this unprecedented method of proof. Plaintiffs totally failed to prove damages on a class-wide basis, and no attempt was made to prove damages on an individual class-member basis.
 
 See Sharp, supra
 
 at 192;
 
 Huddleston, supra
 
 at 556; note 63
 
 supra.